Commonwealth *v.* Ross, Appellant.

Argued November 20, 1972. Before Jones, C. J., Eagen, O'Brien, Roberts, Pomeroy, Nix and Manderino, JJ.

*Raymond J. Lobos,* with him *Graham C. Showalter,* and *Groover & Lobos,* for appellant.

*A. Thomas Wilson,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE POMEROY, July 2, 1973:

The appellant, James L. Ross, was arrested on December 10, 1970 and charged with murder. A jury found him guilty of voluntary manslaughter, for which he was sentenced to serve two to twelve years in a correctional institution. Post-trial motions were denied, and this direct appeal followed.

One Lester Sampsell, a friend of the appellant, was shot and killed on the night of December 9, 1970 (probably soon after midnight, on the morning of December 10) in a wooded area in West Buffalo Township, Union County, Pennsylvania. The scene of the shooting was not far from the home of appellant and the trailer home of appellant's father. The police were alerted to the fact that someone had been shot by telephone calls which Ross made to the office of the sheriff and of the state police from his father's trailer. To the sheriff he declared he had "shot a man and he isn't moving". A little later the victim's father, Herman Sampsell, telephoned to Ross to inquire what was going on. Ross replied, "I got a hell of a lick'n and I know I shot a man".[1] The police in due course arrived at the trailer of

---

[1] The "licking" referred to a beating administered to Ross by one James Easton, who had earlier supervised a deer shooting contest between Sampsell and Ross. The latter accused Easton of placing Ross unfairly in inferior shooting positions. Following some drinks, Ross and Easton agreed to settle the dispute by fisticuffs. After Ross received a trouncing he was heard to say that

Ross, Sr., having first located the scene of the shooting and found Sampsell's body. Immediately upon their arrival, appellant blurted out that he had shot someone, but did not know who. This was repeated several times despite admonition by the police to keep quiet until he had been informed of his constitutional rights. After *Miranda* warnings had been given, appellant again declared that he had shot a man, this time to the county coroner, a medical doctor, who gave Ross a physical examination. Appellant was placed under arrest and taken to the police station within an hour and a half of his arrest.

A number of trial errors are asserted on this appeal. We find none of them meritorious, and will affirm. The points are considered seriatim.

(1) Appellant contends that his statements to the police officers at his father's trailer and those to the coroner should be suppressed because he had not received the warnings mandated by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed 2d 694 (1966).[2] Appellant fails to note that it is *custodial interrogation* which is prohibited by *Miranda,* 384 U.S. at 478. Even were we to assume that Ross became "in custody" the moment the police reached the trailer, at no time did the policemen attempt any questioning. To the contrary, Ross was

_____

he would return with a gun. Indeed he made the same threat to his brother, who drove him home. In was not long thereafter before Ross was sighted near the highway by Easton, Sampsell and others as they drove in the former's car. As the car came abreast of Ross, a shot was heard. Sampsell and another entered the woods, both apparently unarmed. Then another shot was heard, and the sound of someone crashing through the underbrush. The body of Sampsell was later found in the vicinity from which came the sound of the second shot.

[2] This issue was raised at an unsuccessful pre-trial suppression hearing at which time appellant also attempted to suppress the statements he made during the telephone calls. The latter are not questioned on this appeal.

warned to "keep quiet", not merely that he had a right to silence. As we had occasion to repeat recently, " 'Volunteered statements of any kind are not barred by the Fifth Amendment . . .' and are fully admissible even when not preceded by warnings. Miranda v. Arizona, 384 U.S. 436, 478, 86 S. Ct. 1602, 1630 (1966); Commonwealth v. McKinnon, 443 Pa. 183, 186, 278 A. 2d 878, 879 (1971); Commonwealth v. Brown, 438 Pa. 52, 56, 265 A. 2d 101, 104 (1970); Commonwealth ex rel. Vanderpool v. Russell, 426 Pa. 499, 502, 233 A. 2d 246, 247 (1967)." Commonwealth v. Koch, 446 Pa. 469, 476, 288 A. 2d 791 (1972). The statements made by Ross to the police and coroner clearly were in the voluntary category: they were not the product of any police interrogation or duplicity.

(2) Appellant next challenges the introduction into evidence, over objection, of his rifle, a .300 Savage. After daylight on the morning of the shooting the police had conducted a search of the wooded area in which Sampsell was killed for the weapon used. Finding nothing, they went to the trailer of Ross, Sr., who delivered to the police his son's rifle. The gun had been found by the father leaning against the trailer. The police had no search warrant for the weapon, but according to the Commonwealth testimony, it was handed over to the police voluntarily. The suppression judge found that there was valid consent, and we see no reason to disturb that holding. The mere fact that, according to Mr. Ross, one of the state police officers told him "we have to have that gun" and that Ross was not instructed that he had no obligation to surrender it does not warrant us in concluding as a matter of law, as appellant urges, that the "consent" was really duress and coercion.

Moreover, appellant did not live with his father, or store his rifle at the trailer. It is thus quite clear that appellant is here asserting possible violations, not of

his own Fourth Amendment rights, but those of his father.[3] But such rights are personal in nature, and are not to be vicariously asserted. *Alderman v. United States*, 394 U.S. 165, 174, 22 L. Ed. 2d 176, 187 (1969). We therefore need not belabor the issue further.

(3) Over objection of defense counsel, four photographs portraying the deceased's body at the scene of the crime were introduced as evidence at trial. It is claimed that the pictures were gruesome, inflammatory and prejudicial.

The pictures were in black and white and showed the body from three angles. Only two of the photos (Commonwealth exhibits 4 and 7) appear to us doubtful. One depicts a front view of the decedent, fully clothed, lying on his side on the ground. The left half of his neck and face are covered with a dark substance, apparently blood. The other picture is a blow-up of the head to waist section shown in the former photograph; in it one can now discern blood coming from the decedent's mouth.

While the word "gruesome" can probably be accurately applied to these two photographs, we cannot say that the trial judge was in error in allowing their introduction.[4] "The admission of such evidence is largely within the discretion of the trial court." *Commonwealth v. Smalls*, 449 Pa. 15, 18, 295 A. 2d 298 (1972).

In *Commonwealth v. Robinson*, 433 Pa. 88, 249 A. 2d 536 (1969), we said, reiterating what had been previously held in *Commonwealth v. Novak*, 395 Pa. 199, 212, 150 A. 2d 102: "[I]n the trial of criminal cases photo-

---

[3] Appellant's own brief suggests as much: a "knowing, intelligent and voluntary waiver of his Fourth (4th) Amendment rights must be afforded the owner of the household, in this case James M. Ross". Appellant's brief at 19.

[4] The trial judge was of the opinion that the exhibits were neither gruesome nor inflammatory, and that they had important evidentiary value.

graphs of the victim and of the scene of the crime are admissible to aid the jury in their understanding of the alleged crime, the kind of crime it was, exactly what caused the victim's death and what, if any, connection defendant had with it; however, they are not admissible for the purpose of exciting or inflaming the emotions of the members of the jury." Where pictures are gruesome and so may be thought to have an inflammatory effect on the jury, the test to be used by the trial court in judging the admissibility is "whether or not the photographs are of such essential evidentiary value that their need clearly outweighs the likelihood of inflaming the minds and passions of the jurors." *Commonwealth v. Wilson*, 431 Pa. 21, 31, 244 A. 2d 734 (1968). See also *Commonwealth v. Eckhart*, 430 Pa. 311, 242 A. 2d 271 (1968); *Commonwealth v. Powell*, 428 Pa. 275, 241 A. 2d 119 (1968).

In the case at bar the evidentiary value of the photographs was plain. They tended to counter the defendant's theory of self-defense. Ross, testifying on his own behalf, stated that he shot straight at a person in standing position who gave the appearance of aiming a rifle at him, and his shot would have gone "straight through" that person. From the pictures the jurors could see for themselves that Sampsell had been shot in the left side of the neck and could infer that he was shot, as the pathologist had indicated, while in a crouching position by someone off to his left. (His left trouser knee gave indication of kneeling on the ground.) The defendant had said that the person he had shot was in the open, not among trees; the pictures, however, showed that Sampsell had been shot in a wooded area, since there was no indication from the pictures that the leaves on the ground had been disturbed by a dragging of the body. As in *Commonwealth v. Robinson, supra,* we can conclude from the return of a verdict of manslaughter on facts which could well have justified

a verdict of murder that the passions of the jury were not in fact inflamed. We are satisfied that the lower court committed no abuse of discretion in admitting the photographs.

(4)  Next alleged as prejudicial error is the ruling by the trial court retaining an objected-to portion of the testimony of a pathologist who conducted the autopsy of Sampsell. The testimony in question concerns a statement by the pathologist, a Dr. Mikhail, that the fragments of the bullet remaining in the deceased's body "exceed the size of a .22 bullet". Appellant argues that because Dr. Mikhail was not a ballistics expert he was thereby unqualified to state an opinion on this subject. We disagree.

Dr. Mikhail was a medical doctor with over ten years experience in pathology; he had examined "fifteen or twenty" cases of gunshot wounds. This experience and training qualified him to make the limited appraisal he gave as to the size of the projectile that struck and killed Sampsell. He did not testify as to the exact size of the bullet, just that the amount of lead fragments remaining in the body of the deceased, as revealed by x-rays and the fact of an exit wound, indicated that the bullet was larger than a .22. The doctor was competent to state this opinion.

(5)  Appellant's final assignment of error is that the district attorney exceeded the bounds of fair play during his cross-examination of the defendant and during his summation to the jury.

We have reviewed these alleged instances of misconduct[5] and find that the remarks by the district attorney,

---

[5] Only one of the statements made by the district attorney was objected to at trial by appellant's counsel. We quote from the notes of testimony during the cross-examination of the defendant (pp. 679, 680) : "Q. (By the District Attorney) : If you would have hit him, where would the bullet hit him? A. (By the defendant) : Accord'n to the way the man was stand'n when I seen him, I would

even though strongly made, were legitimate inferences from facts previously presented at the trial and did not have the unavoidable effect of prejudicing the jury by "forming in their minds fixed bias and hostility toward the defendant, so that they could not weigh the evidence and render a true verdict." *Commonwealth v. Simon,* 432 Pa. 386, 394, 248 A. 2d 289, 292 (1968). See also *Commonwealth v. Toney,* 439 Pa. 173, 266 A. 2d 732 (1970). In short, while we do not approve the district attorney's statement as quoted in the margin, it does not rise to that degree of offensiveness which we found in *Commonwealth v. Potter,* 445 Pa. 284, 285 A. 2d 492 (1971), wherein the prosecutor branded the testimony of the defendant a "malicious lie".[6]

---

have shoot the man straight through. Q. Was there ever a body found out there that was dead? that had a bullet hole right through him there? A. I couldn't testify actually my bullet would've hit the man, but— Q. But did you aim at him there and you shot. A. I just aimed at an object. I just took and whirled and fired. Q. Why would you ever have told all these people you shot a man if you shot at some object? A. There was a possible chance of it and I didn't— Q. What do you mean 'a possible chance?' A. There was a possible chance that I hit that man. Q. You knew you hit that man! He was right there on his knees and you shot him! A. I didn't do no such thing like that. Q. Where is this body that you shot, then? There was one body out there, it was Lester Sampsell, and you know how the wound was inflicted. You heard the testimony and you know how he died. There was nobody else. Henry Ulrich is still here. All of the same people that were with you are still on this earth but Lester Sampsell, and he's not here because of you! MR. SHOWALTER: I object, Your Honor. That's prejudicial. MR. WILSON: I'm through. MR. SHOWALTER: I would also like to object to the fact that everybody isn't here. THE COURT: It would be more properly used in the final argument rather than this time; however, it's cross-examination and we're not going to restrict either of you on cross-examination."

[6] Appellant also contends that the evidence was insufficient to support the conviction of voluntary manslaughter. This point is patently unmeritorious and does not warrant further discussion in the opinion.

Judgment of sentence affirmed.

Mr. Justice ROBERTS and Mr. Justice NIX concur in the result.

Mr. Justice MANDERINO dissents.