Commonwealth, Appellant, *v.* Eden.

Argued January 16, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

*Arthur R. Makadon,* Assistant District Attorney, with him *James D. Crawford,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *Arlen Specter,* District Attorney, for Commonwealth, appellant.

*Edward Reif,* for appellee.

Opinion by Mr. Justice Manderino, March 25, 1974:

This is an appeal by the prosecution from a pretrial order suppressing evidence. The appellee, Anthony Eden, was indicted for the murder of his mother, Anna Eden. Prior to trial, appellee's application to suppress evidence, consisting of all statements given to the police by the appellee, was granted. The prosecution then filed this appeal from the order suppressing the appellee's statements.

The prosecution challenges the findings of fact and conclusions of law made by the suppression court. The findings of fact, however, are supported by the record and the conclusions of law are justified by the findings of fact. We must, therefore, affirm. *Commonwealth v. Sharpe,* 449 Pa. 35, 296 A. 2d 519 (1972); *Commonwealth v. Harmon,* 440 Pa. 195, 269 A. 2d 744 (1970).

Anna Eden, mother of the appellee, was stabbed to death on December 4, 1971. The next morning, the appellee, a fourteen-year-old boy, was picked up by the police at his aunt's home where he had spent the night. The appellee's aunt was the sister of the victim. The appellee was brought to the police administration building at about 8:40 a.m. He was given the *Miranda* warn-

ings at about 9:30 a.m. Between 9:30 a.m. and 3:30 p.m. a period of about six hours, the appellee denied any involvement in his mother's death. The appellee first made inculpatory statements at the end of the six hour period. A formal statement was signed by the appellee at about 8:15 p.m., almost twelve hours after his original police custody began.

The suppression court found that the appellee, a fourteen-year old, was laboring under a diminished mental capacity, as a result of glue inhalation and the use of narcotics, at the time the appellee waived his constitutional rights. Based on that finding, the suppression court concluded that the appellee's waiver of his constitutional rights, when given the *Miranda* warnings, was not a knowing and intelligent waiver. The legal conclusion is justified from the suppression court's findings. An examination of the record discloses that there was sufficient evidence to support the findings of the suppression court. After the discovery, on the evening of December 4, 1971, that Anna Eden had been stabbed to death, the appellee was taken to the Temple Hospital where he was treated for sniffing glue. The drug, valium, was administered to the appellee at the hospital. He was taken to his aunt's home. The aunt testified that the appellee was up and around most of the night. He would get out of bed and walk around in a daze. He kept bumping into things. The appellee's aunt awakened him about 7:00 a.m., because the appellee, along with other members of the family, was asked to be at the police administration building that morning. The aunt testified that the appellee could not walk by himself, when awakened, and could not talk. The appellee was very incoherent. He had to be dressed by his aunt. He was brought downstairs and passed out on the couch. When the police arrived, they awakened the appellee, and asked him to tell them his name. He was not able to respond until asked three or four

times. The police officers had to hold the appellee up under both arms as they were taking him from the house to the police car. The *Miranda* warnings were given to the appellee about one hour later. A psychiatric examination by the Probation Department of the Court of Common Pleas revealed that the appellee scored at the "lower end of the average range on the verbal section with a score of 90. His sub-score profile indicated consistency on all tests except social judgment which is presently functioning at the defective level." Based on the evidence concerning the condition of the appellee less than an hour before he was asked to waive his constitutional rights, the appellee's age and the psychiatric report, the suppression court concluded that the waiver was not knowing and intelligent. The prosecution points out that there was testimony by police officers that the appellee was alert, responsive, and like any other normal person. Questions of credibility, however, were for the suppression court. The record supports the findings and the findings justify the legal conclusion that at 9:30 a.m., on December 5, 1971, the appellee, a fourteen-year-old boy was not able to knowingly and intelligently waive his constitutional rights.

The suppression court also concluded that the appellee had not voluntarily made the inculpatory statements. That conclusion was based on the appellee's condition when police custody began at about 8:30 a.m., and the events that followed until 3:30 p.m., when the appellee made his first inculpatory statement. The record shows that the appellee denied any involvement in the crime until seven hours after police custody first began and almost six hours after he was given the *Miranda* warnings. During that time he was being interrogated for almost five and one-half hours of the six hours. The suppression court also found that of the twelve hour period between the time the appellee first arrived at the police administration building and the

time he signed a formal statement, at least seven hours of actual interrogation had taken place. The suppression court considered the age of the appellee, his condition at the time he was placed in police custody, the interrogation time prior to any inculpatory statement, and concluded that the confession was involuntary. The record supports the findings of the suppression court and the legal conclusion is justified from those findings. There is no basis for disturbing either the findings of fact or the legal conclusion.

Order affirmed.