335 A.2d 704
**COMMONWEALTH of Pennsylvania**
**v.**
**Allen TUCKER, Appellant.**

Supreme Court of Pennsylvania.

Argued April 16, 1974.
Decided March 18, 1975.

Rehearing Denied April 29, 1975.

194

---

Harry D. Sporkin, Morris Paul Baran, Philadelphia, for appellant.

F. Emmett Fitzpatrick, Jr., Dist. Atty., Richard A. Sprague, First Asst. Dist. Atty., David Richman, Asst. Dist. Atty., Chief, Appeals Div., John Isom, Asst. Dist. Atty., Abraham J. Gafni, Deputy Dist. Atty. for Law, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

POMEROY, Justice.

Appellant was convicted by a jury in October 1973 of murder in the first degree and attempted aggravated robbery.[1] His post-trial motions were denied and he was sentenced to life imprisonment on the murder conviction and a concurrent term of ten to twenty years on the robbery conviction. He has now filed this appeal.[2]

---

[1] Appellant had been tried and convicted previously of the same crimes, but those convictions were reversed by this Court on the ground that at the first trial the Commonwealth had been permitted to exceed the permissible scope of cross-examination of its own witness. *Commonwealth v. Tucker*, 452 Pa. 584, 307 A.2d 245 (1973).

[2] This court has jurisdiction of the appeal filed from the judgment of sentence on the murder conviction by virtue of the Act of July 31, 1970, P.L. 673, No. 223, art. II, § 202, 17 P.S. § 211.-

The defendant has alleged four grounds which he contends require the reversal of the judgments of sentence. For the reasons stated hereinafter, we will affirm.

The salient facts are as follows. On February 11, 1969, at approximately 5:00 A.M., one James Patrick Costello was stabbed in the neck while sitting in the men's room of the Family Theatre in Philadelphia. The wound proved fatal. Allen Tucker and one Cornell Berry, appellant's co-defendant, were observed shortly after the incident running up the stairs from the men's room and fleeing the theatre. Later the same day both Tucker and Berry were arrested and charged with the crime. Tucker subsequently gave the police a statement in which he admitted stabbing Costello when Costello resisted an attempt to rob him.

Two of appellant's alleged errors concern the admission of his confession into evidence. He contends, first, that the confession was involuntary, and second, that it was the product of an "unnecessary delay" between the time of his arrest and the time that he was preliminarily arraigned.

█ █ In passing on a claim that a confession was involuntarily obtained we review the totality of circumstances surrounding the giving of the statement being challenged. *Clewis v. Texas,* 386 U.S. 707, 708, 87 S.Ct. 1338, 18 L.Ed.2d 423, 426 (1967); *Culombe v. Connecticut,* 367 U.S. 568, 601, 81 S.Ct. 1860, 6 L.Ed.2d 1037, 1057 (1961); *Commonwealth ex rel. Butler v. Rundle,* 429 Pa. 141, 149, 239 A.2d 426 (1968). Where, as here, the lower court has determined that the confession was voluntary, we are to consider only "the evidence of the prosecution's witnesses and so much of the evidence for

202(1). The appeal from the judgment of sentence on the robbery charge was, quite properly, initially filed with the Superior Court. That court then certified the appeal to this Court in order that the appeals from the two convictions might be heard together, the same factual situation being common to both.

the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Culombe, supra,* 367 U.S. at 604, 81 S.Ct. at 1880. *See also, Commonwealth v. Riggins,* 451 Pa. 519, 304 A.2d 473 (1973); *Commonwealth ex rel. Butler v. Rundle, supra,* 429 Pa. at 149–50, 239 A.2d 426. Applying these rules to the facts of the instant case, we have concluded that the appellant was fully capable of waiving his constitutional rights [3] and that his confession was voluntary and, therefore, properly admitted into evidence.[4]

Appellant predicates his first claim primarily upon the fact of his low intelligence and allegedly unstable emotional state. At the time of his arrest, Tucker was 19 years of age. According to his mother, he had gone to school only through second grade, but in his confession Tucker stated that he had completed the fifth grade. He had an IQ in the range of 75 to 79 and could read at a grade level of 2.7. A psychiatrist called by appellant at the suppression hearing testified that appellant was "a constitutional psychopath" and a mild mental defective.

These factors alone are insufficient to render defendant's confession involuntary. In numerous cases we have held that defendants with comparable intelligence quotients and similar psychological evaluations were capable of waiving their constitutional rights and giving voluntary statements. *See, e. g., Commonwealth v. Fogan,* 449 Pa. 552, 296 A.2d 755 (1972); *Commonwealth v. Abrams,* 443 Pa. 295, 278 A.2d 902 (1971); *Commonwealth v. Darden,* 441 Pa. 41, 271 A.2d 257 (1970), cert. denied, 401 U.S. 1004, 91 S.Ct. 1243, 28 L. Ed.2d 540 (1971); *Commonwealth v. Willman,* 434 Pa. 489, 255 A.2d 534 (1969); *Commonwealth ex rel. Joyner*

---

3. No claim is made that appellant was not properly advised of his constitutional rights at all times.

4. No new suppression hearing was held prior to Tucker's retrial. The confession was admitted into evidence at the second trial on the basis of the determination of admissibility made at the suppression hearing held prior to the first trial.

*v. Brierley,* 429 Pa. 156, 239 A.2d 434 (1968). We have carefully read appellant's own testimony at the suppression hearing. It was completely coherent and rational. We are satisfied that the hearing judge was justified in concluding that appellant was fully capable of understanding his situation and reacting accordingly. *Commonwealth v. Darden, supra.*

■ Appellant additionally contends that his signing of his confession was brought about by "suspect" police tactics which should vitiate the entire confession. Appellant points particularly to the fact that after the completion of his formal statement but before it was actually signed by him, his paramour, Stephanie Hill, and the two month old child of Tucker and Miss Hill were brought into the interrogation room. The purpose in bringing Miss Hill to the room was to have her read appellant's statement to him, since the police were aware of his reading difficulty. During the reading of the statement appellant was holding his infant baby in his arms; he testified that the baby was crying, jumping and in need of a diaper change. We fail to see how these facts, even if true, support appellant's claim of involuntariness. As the lower court observed in its opinion, "[a] smelly diaper has not yet been found to be police coercion." The presence of Tucker's paramour and the child itself, if it had any effect, tended to make appellant's confrontation with the police *less,* not more, coercive. *See, e. g. Miranda v. Arizona,* 384 U.S. 436, 478, n. 46, 86 S.Ct. 1602, 16 L.Ed.2d 694, 726, n. 46 (1966). *Cf. Commonwealth v. Harmon,* 440 Pa. 195, 269 A.2d 744 (1970).

■ Dr. Nelson, the defense psychiatrist, testified that Tucker was susceptible to suggestion and unable to tolerate tension. He suggested that Tucker might have signed the statement just to release the tension built up during his questioning and the reading of the statement by Miss Hill. At a later point in his testimony, the doc-

tor appeared to take the position that *anyone* who gave and signed a confession had to be "very masochistic." His testimony suggests that the very giving of an inculpatory statement is indicative of some sort of emotional incapacity which should vitiate the voluntariness of the confession. The law has never recognized such a proposition. The suppression court was free to reject this theory, and also to consider it as weakening the doctor's explanation of Tucker's signing of the confession. The degree of credence to be given to opinion evidence of this sort is primarily within the discretion of the fact-finder, to whose judgment we will defer if there is support for it in the record. *Commonwealth v. Embry*, 441 Pa. 183, 272 A.2d 178 (1971). *See also Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974); *Commonwealth v. Karchella*, 449 Pa. 270, 273, 296 A.2d 732, 733 (1972).

One additional factor bearing upon the voluntariness of appellant's confession must be considered: the length of his interrogation before arraignment.[5] *Commonwealth v. Koch*, 446 Pa. 469, 474–75, 288 A.2d 791 (1972). Appellant was arrested at 2:00 P.M. on February 11, 1969. After being transported to the police administration building and being advised of his constitutional rights (which he waived), an intelligence summary was taken by the police, which included such things as Tucker's full name, employer, address, etc. From 3:33 to 4:20 P.M., appellant gave a statement in which he admitted witnessing the stabbing, but denied being a participant. After being allowed to rest, appellant consented to a polygraph examination, which was administered to him from 4:45 to 8:20 P.M. He was then told that he had flunked the test. Thereafter Tucker was confronted by his co-defendant, Cornell Berry, who identified Tucker as the one who had done the stabbing in the Family Theatre. Tucker's immediate reaction was, "I didn't believe

5. This is not to be confused with the so-called *Futch* issue which will be discussed *infra*.

he would do this to me," whereupon he said to the police, "I'll tell you the truth." It was at this point that he admitted to the stabbing of James Costello.

At approximately 9:00 P.M., after appellant had again waived his constitutional rights, he began giving the formal statement which was introduced into evidence. During the taking of the statement appellant was given various breaks for water, rest and eating, so that the statement, which consisted of 11 typewritten pages, was not completed until 2:10 A.M., February 12, 1969. Appellant was given an opportunity to rest, and then Miss Hill was called in to read the statement to him. The reading concluded, appellant signed the statement. This occurred at 3:29 A.M. The exact time of arraignment does not appear from the record, but obviously it was sometime after 3:29 A.M.

On these facts, we are unable to conclude that either the length of interrogation or the time span between appellant's arrest and arraignment rendered his confession involuntary. *Cf. Commonwealth v. Eiland*, 450 Pa. 566, 301 A.2d 651 (1973). Appellant's initial inculpatory statement came approximately six hours after his arrest. During that six hours he was not subjected to prolonged interrogation or any other form of "impermissible psychological coercion." *Eiland, supra,* at 574, 301 A.2d at 654. At all times the defendant indicated his willingness to cooperate with the police and was properly advised of his constitutional rights. Since the appellant during his initial interrogation by the police admitted that he had knowledge of the crime being investigated, the police would have been remiss had they not questioned him further. As Mr. Justice Frankfurter noted in his opinion in *Culombe v. Connecticut, supra:* " 'Questioning suspects is indispensable in law enforcement' . . . '[T]he public interest requires that interrogation, and that at a police station, not completely be forbidden, so long as it is conducted fairly, reasonably,

within proper limits and with full regard to the rights of those being questioned.'" 367 U.S. at 578–79, 81 S.Ct. at 1865, 6 L.Ed.2d at 1044. We believe that this standard has been met here.

[■■] Appellant next contends that his confession should have been excluded from evidence because it was obtained during an "unnecessary delay" between his arrest and arraignment in violation of Pa.R.Cr.P. 130, 19 P.S. Appendix. We need not, however, consider the merits of this argument because we find the issue to have been waived by the failure to raise it at trial. The exclusionary rule consequent upon violation of Rule 130 was announced in *Commonwealth v. Futch*, 447 Pa. 389, 290 A.2d 417 on April 20, 1972. Although the suppression hearing in this case was held more than two years before the decision in *Futch*, appellant's re-trial did not take place until December, 1973, some twenty months after *Futch*. The claim of error in not excluding the confession by reason of unnecessary delay was not made to the trial judge, but was raised for the first time on post-trial motions. This was untimely, and the issue will not now be considered by this Court. *Commonwealth v. Segers*, 460 Pa. 149, 331 A.2d 462 [1974]; *Commonwealth v. Johnson*, 457 Pa. 554, 327 A.2d 632 (1974); *Commonwealth v. Reed*, 458 Pa. 8, 326 A.2d 356 (1974); *Commonwealth v. Blagman*, —— Pa. ——, 326 A.2d 296, 300 (1974) (concurring opinion of Roberts, J., joined by Justices Jones, O'Brien, Nix and Manderino).

Appellant's next contention is that a statement made by the prosecutor during his summation to the jury was so inflammatory that the trial judge should have granted defense counsel's request for a mistrial. The remark in question was made during the prosecutor's description of the Family Theatre, the place of the killing: "[I]t was a great haven for people to roll drunks there because these drunks couldn't identify anybody. They didn't even

know they were rolled until the next morning, and also a great place to rob someone. . . . "

While it is true, as appellant asserts in his brief, that there was no direct evidence that the Family Theatre was indeed a "great haven" for rolling drunks, a prosecutor in his remarks to the jury is not limited merely to a recitation of the evidence; he may also point out any legitimate inferences which may be drawn from that evidence. *Commonwealth v. Goosby,* 450 Pa. 609, 612, 301 A.2d 673 (1973). The appellant in his statement admitted that his reason for being in the men's room of the theatre at 5:00 A.M. was to "lay for somebody to come through that we could steal some money off." The obvious purpose of the prosecutor's remarks was to explain why the defendant chose that particular place to rob someone. We fail to see how appellant was prejudiced by the prosecutor's remark; it "did not result in an unfair trial or prevent the jury from weighing the issue in an objective manner." *Commonwealth v. Toney,* 439 Pa. 173, 180, 266 A.2d 732, 736 (1970). See also, *Commonwealth v. Pierce,* 453 Pa. 319, 323, 309 A.2d 371 (1973); *Commonwealth v. Ross,* 452 Pa. 500, 508, 307 A.2d 898 (1973).

Appellant's final assignment of error relates to his conviction on the charge of attempted aggravated robbery. He alleges that the trial court erred in admitting into evidence those portions of his confession relating to the attempted robbery of the victim because the Commonwealth had failed to prove independently the corpus delicti of that offense. In light of our decision in *Commonwealth v. Leamer,* 449 Pa. 76, 295 A.2d 272 (1972), we find this allegation to be without merit.

Judgments of sentence affirmed.

ROBERTS, J., filed a dissenting opinion in which NIX, J., joined.

202

MANDERINO, J., filed a dissenting opinion.

MANDERINO, Justice (dissenting).

I dissent. In *Miranda v. Arizona,* 384 U.S. 436, 457, 86 S.Ct. 1602, 1618, 16 L.Ed.2d 694, 714 (1966), there is reference to nonphysical intimidation which is "destructive of human dignity." *Miranda* presents the following example taken from Professor Sutherland's article, Crime and Confession, 79 Harv.L.Rev. 27, 37 (1965):

> " 'Suppose a well-to-do testatrix, says she intends to will her property to Elizabeth. John and James want her to bequeath it to them instead. They capture the testatrix, put her in a carefully designed room, out of touch with everyone but themselves and their convenient "witnesses," keep her secluded there for hours while they make insistent demands, weary her with contradictions of her assertions that she wants to leave her money to Elizabeth, and finally induce her to execute the will in their favor. Assume that John and James are deeply and correctly convinced that Elizabeth is unworthy and will make base use of the property if she gets her hands on it, whereas John and James have the noblest and most righteous intentions. Would any judge of probate accept the will so procured as the "voluntary" act of the testatrix?' "

To consider the execution of the will in the above example voluntary would be even more absurd if the testatrix had been asked to hold her grandchild—"crying, jumping and in need of a diaper change"—on her lap while she signed.

The *Miranda* court expressed concern over such an "interrogation atmosphere" and the toll it takes on individual liberties. *Id.* at 455–456, 86 S.Ct. at 1617–18, 16 L.Ed.2d at 712–713. Employing crying babies with "smelly diapers" (see majority opinion) further fouls the air and hastens the asphyxiation of the accused's constitutional rights.

The appellant's confession was not a voluntary confession.

ROBERTS, Justice (dissenting).

I dissent. In light of the lengthy delay before appellant's preliminary arraignment and his low intelligence, I cannot conclude that appellant's waiver of his constitutional rights was voluntary. See *Commonwealth v. Starkes*, 461 Pa. 178, 335 A.2d 698 (1975); *Commonwealth v. Simms*, 456 Pa. 1, 317 A.2d 265 (1974).

NIX, J., joins in this dissent.