444 A.2d 1199

**COMMONWEALTH of Pennsylvania**

v.

**Harold NEELY, Appellant.**

Superior Court of Pennsylvania.

Argued April 7, 1981.

Filed April 23, 1982.

330

Leonard J. Gajewski, Reading, for appellant.

George C. Yatron, District Attorney, Reading, submitted a brief on behalf of Commonwealth, appellee.

Before SPAETH, HOFFMAN and VAN der VOORT, JJ.

SPAETH, Judge:

This is an appeal from judgments of sentence for attempted robbery, aggravated assault, and former convict not to own a firearm. Appellant seeks an arrest of the judgments or a new trial. We have concluded that he is not entitled to an arrest of any of the judgments but is entitled to a new

trial on the charges of attempted robbery and aggravated assault. We affirm the judgment of sentence for former convict not to own a firearm.

On March 6, 1977, at about 9:00 a. m., Susan Bonk heard "thuds" and cries of "I don't have any money" coming from her neighbor John Pearson's apartment. She called the police, and Officer Daniels responded. He entered the Pearson apartment and found Pearson, a 73 year old man, severely beaten and bleeding on the floor. Pearson was taken to the hospital in a comatose state. (At the time of trial Pearson had not regained sufficient mental capacity to testify.) Two men who were in his neighborhood at the time saw appellant, with bright red hair, and two companions flee in a direction away from the Pearson apartment. About twenty minutes later appellant and his two companions were arrested, some six to eight blocks away. Appellant had a .32 caliber revolver.

About ten hours after his arrest, appellant notified Detective Donald Matz that he wished to confess. After being read his constitutional rights as required by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965), appellant confessed. His confession consisted of two parts, both of which were read to the jury.

The first part of appellant's confession was in response to a series of questions posed by Detective Matz. It was as follows:

Q. What is your full name?

A. Harold Spencer Neely.

Q. What is your home address?

A. 400 Church Street, Reading, Pa.

Q. Where are you employed?

A. Self-employed.

Q. Can you read and write the English language?

A. Yes.

Q. How far did you go in school?

A. Yes. I attended college.

Q. What college did you attend?

A.  Allegheny Community College, Luzerne Community College and Northampton Community College and the University of Pittsburgh.

Q.  Did you major in any particular subject?

A.  Yes.  I majored in psychology.

Q.  Have you consumed any alcoholic beverages within the past 24 hours?

A.  Yes.

Q.  What type of beverage and how much did you consume?

A.  I don't know.  I drink all of the time.  I drink whisky and beer.

Q.  Have you taken any drugs or medications within the past 48 hours?

A.  Yes, I took some "TIC" yesterday afternoon.

Q.  What is "TIC"?

A.  It is an animal tranquilizer.

Q.  How did you take the "TIC"?

A.  I dropped it.

Q.  What does "dropping" mean?

A.  I took it by mouth.

Q.  Are you affected by the "TIC" or the alcohol at the time of this statement?

A.  I don't think that I am.

Q.  We are investigating an assault that occurred at 206 North Ninth Street today, being March 6, 1977.  Do you know anything about this incident?

A.  Yes, I do.

Q.  Can you tell us what you know about this incident?

A.  Approximately one month ago I went to see John Pearson at his store because I was interested in faith healing.

Q.  How did you find out about John Pearson?

A.  I didn't.  I just went into his store one day and a conversation started on faith healing.

Q.  Did you ever attend any of his faith healing sessions?

A.  No, I never went to his temple.

Q. Did you go to John Pearson's home today, being March 6, 1977?

A. Yes.

Q. Why did you go there?

A. To test the "bastard."

Q. Did you go alone?

A. No.

Q. Who was with you?

A. I didn't know their names.

Q. If you didn't know the individual's names that you were with, how did you get in contact with them?

A. An unknown person that I do not want to reveal his name recommended these two people to me.

Q. Did you make an appointment to see John Pearson today?

A. Yes.

Q. When did you make the appointment?

A. I made a call yesterday and spoke with a woman. I made another one this morning and Mr. Pearson told me to come to the house between 9:00 and 10:00 a. m. and bang on the front door; that he, Mr. Pearson, would be in the kitchen.

Q. What time did you arrive at the store and home of John Pearson?

A. Around 9:00 a. m.

Q. What happened when you arrived?

A. He let us in and we went up stairs. I told Pearson that I don't have any money but that I would write him a check. Pearson then asked me if I had a car. I told him that I had a car. He then asked me if I owned a home. Pearson then asked me if I could get the deed. I said yes and slapped him alongside the head with my hand.

Q. What happened after you slapped John Pearson?

A. He fell backwards and fell against the chair. He kicked at me and called me a son-of-a-bitch.

Q. Then what happened?

A. I really went at him and really worked him over.

Q. What did you work him over with?

A. I really don't know.

Q. Were you angry when you were assaulting John Pearson?

A. I must have been boiling.

Q. What caused you to become angry with John Pearson?

A. When he asked me for the deed to my house.

Q. What did the two people who were with you do?

A. I noticed that when the first time that I hit Pearson, the other two disappeared and I was alone.

Q. What did you do after you struck Pearson?

A. I just ran.

Q. Did you have a gun on your person when you entered the Pearson residence?

A. No, I didn't. Sometime when I was assaulting Pearson, I noticed that his hand was reaching towards his back. I grabbed his arm and pulled it and when I pulled on his hand, I observed a gun in one of his hands. I don't recall which hand it was.

Q. Was the gun in question fired during the assault?

A. I don't know.

Q. Did you demand any money from Pearson?

A. No, but when I smacked him, he said, "I don't have any money."

Q. Do you remember throwing anything into a yard after you fled the Pearson residence?

A. I don't remember, but I might have.

Q. Did you take the gun away from John Pearson?

A. Yes, I guess I did.

Q. Do you remember what happened to the mentioned gun?

A. The police took it from me.

Q. After having read this statement, is there any additions that you wish to make?

A. I would like to type myself what I want to say.

Q. Is there anything on this statement that is erroneous?

A. No.

N.T. 96–99.

The second part of appellant's confession was a statement by appellant. It was as follows:

This is a voluntary statement typed by myself, Harold S. Neely as a supplement to the foregoing. I am not making it to add to the general confusion of events but to clarify for myself and others the unbelievable series of events that could allow a dedicated born again Christian to assault a Holy Man of another faith.

First of all, I shot Bootsie Williams accidentally in 1969. I think I never really got over the shock, but I attended several schools, joined several civic organizations, became converted to New Testament Christianity and tried to do what I could to salvage some of the mess. But most of this was sacrificed for a four year experiment in behavior-mod that eventually at some point of confusion, goal-thwarting, desensitization and the rest of it might have driven me quite mad.

But, God, I thought, in His infinite mercy did allow me to survive, and I returned to society sufficiently docile to try it again. I worked for the state as an advocate for predelinquents, acted as a foster parent, salesman, scanner for Dun and Bradstreet, consultant, manager and therapist for a health club chain, and eventually established a sign company of my own. All this, however, was dismissed and I was compelled to return to Reading to function on welfare and roam the streets. Roam the streets with the gamblers, pimps, drug people and commit every outrage to God and man.

Okay, eventually I was able to establish a home and a business. This however, was not enough to honor my commitment to a very generous if tricky God who somehow pulled me through the most horrible seven years possible. The state refused to allow me to really function as any of the above, so I established my own home as a gathering place for troubled youth. However, where there are youth gathering there invariably is smoke and fire. Not the Holy fire of God Almighty but the smoke of hashish, reefer, and

the fire of alcohol and sex. But there is also ideas, not necessarily good, sound, solid thoughts, but deep, honest, real thoughts of an open and troubled youth. So as an unofficial house-manager for the neighborhood kids, I experienced the anger of a job-hungry, free and footloose, undisciplined young America who preoccupied themselves with human need, sexual urgency, ripoffs and castoffs by modern-day America. We talked, thought, smoked and shook our fingers at an America who just didn't seem to care about pain, deprivation, hunger, loneliness or any of the fundamental human needs that really made America lovable.

One day as a salesman I went into the store of a John Pearson on Ninth Street in Reading who had amassed the blessings of 25 stores and a Temple of a thousand people as the Lord's minister of mercy healing. I discussed this disciple in one of our groups. We discussed fully and agreed that John Pearson was a demon who was wearing the Lord's mantle to ward off the ugly winds of poverty and honest work. Somehow we got the idea of testing his own faith and trying his powers. We were going to manufacture a case and see just how close to God this person really was. Since I was black we needed several young blacks to pose as my relatives in determination of his ability to read a person's character and spiritual skills.

Someone recommended a person who eventually recommended another more appropriate young person to act as my nephew. The nephew in turn recommended a girl to act his wife's part. Several phone calls were made and an appointment was made. Charlene and Butch and myself went to his apartment for a reading. We fed him pure crap to see if he could see through it. I was enraged at the thought of a Holy man amassing 25 little stores and a Temple off the misery and hunger of a confused and helpless America. He (John) picked up our leads and fed us back pure bullshit. I told him that I didn't have much money for the reading but would give him a small check. He asked if I owned a car or a home and if I would get the deeds to hold as good faith. I

thought of all the jewelry and money he had gotten off of thousands of people in trouble in the name of the Holy God, the only thing Americans have to hold on to. I saw red and said "yes, here is a deed," striking him in the face. He fell on a chair, said, "I have no money" and kicked at my groin. No money, I thought, at a time like this. I tore into him. At some point he pulled a gun from under his head, on a string or something. I took it from him. Everything had gotten quiet. My nephew and niece had fled in terror. I ran out and caught up with the girl who was a little hysterical. We ran away until apprehended by the police. I am amazed this could happen but think it was the Lord's way of forcing me to keep a promise of commitment to Him, if not for good, then for evil. But I do firmly believe that John Pearson is one of the many demons who populated the earth at the time the heavenly rebellion and that him and his ilk are causing all the anger, confusion, repression, exploitation and fear of a evil, war-minded, ripoff world. Whether Charlene and Butch were meant to be sacrificed with me I do not know. I do know that they were in no way responsible for anything more than the frivolity of a prank-minded youth who, though confused and misguided, and really sincerely interested in finding a better world. I am not sure what all this means to myself or anyone else. Sometimes I think I am absolutely right in ridding the world of a evil demon, and at others I am a little confused. I once hurt a manager of our health chain for stealing our books for the devil and felt no confusion, and in spite of my feeling about John, I do feel funny about the girl and boy being a pawn, either of mine or God.

N.T. 100–02.

After reviewing these two documents, appellant tore them up. The police, however, were able to patch the pieces back together.

To demonstrate that appellant was a former convict, the Commonwealth introduced the testimony of Wanda Seely, the Clerk of Court in Montgomery County, and of Detective

Elmer Bitting of the Reading Police. Wanda Seely introduced the original record of the Montgomery County Court, which showed that on October 16, 1964, appellant had pleaded guilty to burglary, larceny, and receiving stolen property, and that the judgments of sentence imposed on those pleas had become final. N.T. 87–88. Elmer Bitting testified that as a member of the Reading Police force he had arrested appellant on March 17, 1964, pursuant to information supplied by the Pottstown Police Department. N.T. 91.

Appellant's defense was insanity. He supported this defense by introducing the testimony of two witnesses. An acquaintance, Eddie Howard, testified that appellant was exhibiting bizarre behavior—including dyeing his hair a bright red-orange—the night before he attacked Pearson. N.T. 115–19. Dr. Joel Podolsky, a psychiatrist, testified that appellant was in a "paranoid mental state" at the time he attacked Pearson and was unable to appreciate "the nature and quality of his act [as being] wrong." N.T. 132. Although Dr. Podolsky thought appellant knew he was attacking Pearson, he concluded that "[appellant] did not think it was wrong" because in his "distorted reasoning he thought that it was right to rid the world of demons and he was not acting against God; in fact, that perhaps he was meant to do this." N.T. 133.

–1–

■ Appellant's request for an arrest of the judgments of sentence may be summarily dismissed. In his post-verdict motions appellant stated in conclusory fashion that the evidence was insufficient to sustain the jury's verdict. He did not state in what respect the evidence was insufficient. When an appellant has failed to state in what respect the evidence fails to sustain his conviction, his challenge to sufficiency will be considered waived. *See Commonwealth v. Philpot*, 491 Pa. 598, 421 A.2d 1046 (1980).

–2–

■ Appellant argues that he is entitled to a new trial because his confession should have been suppressed. He

contends that the Commonwealth failed to prove that he knowingly and voluntarily waived his right against self-incrimination.[1]

The Commonwealth had the burden of proving by a preponderance of the evidence that appellant's confession represented a knowing and voluntary waiver of his right not to incriminate himself. *Commonwealth v. Bullard*, 465 Pa. 341, 350 A.2d 797 (1976), *Commonwealth v. Jones*, 459 Pa. 286, 328 A.2d 828 (1974); *Commonwealth v. Fogan*, 449 Pa. 552, 296 A.2d 755 (1972). Our responsibility is "to determine whether the record supports the factual findings of the court below and the legitimacy of the inferences and legal conclusions drawn from these findings." *Commonwealth v. Goodwin*, 460 Pa. 516, 521, 333 A.2d 892, 895 (1975). *See also Commonwealth v. Kichline*, 468 Pa. 265, 361 A.2d 282 (1976). In making that determination, we must consider the "evidence of the prosecution's witnesses and so much of the evidence of the defense as, fairly read in the context of the record as a whole, remains uncontradicted." *Commonwealth v. Kichline, supra*, 468 Pa. at 281, 361 A.2d at 290. *See also Culombe v. Connecticut*, 367 U.S. 568, 604, 81 S.Ct. 1860, 1880, 6 L.Ed.2d 1037 (1961); *Commonwealth v. Goodwin, supra; Commonwealth v. Riggins*, 451 Pa. 519, 304 A.2d 473 (1973); *Commonwealth v. Davenport*, 449 Pa. 263, 295 A.2d 596 (1972). It is, however, exclusively the province of the suppression court to determine the credibility of the witnesses and the weight to be accorded their testimony. *Commonwealth v. Butch*, 257 Pa.Superior Ct. 242, 390 A.2d 803 (1978).

Detective Donald Matz testified at the suppression hearing to the following effect. On March 6, 1977, at about 7:30 p. m., appellant on his own initiative requested to speak to a

---

1. Appellant also argues that his confession should have been suppressed because he revoked it, as a testator would his will, when he tore up the paper on which it was written. Brief for Appellant at 10. A confession, unlike a will, however, is not an ambulatory instrument; the confessor, unlike the testator, does not, once he has knowingly and voluntarily confessed, have the power to change his mind.

detective. After his *Miranda* rights were read to him, appellant indicated that he understood what those rights were but nonetheless wanted to make a statement and did not want to have an attorney present. The detective then engaged appellant in the question and answer session that resulted in the first part of appellant's confession, which we have quoted above. When he had completed that session, appellant asked to make a further statement on his own. He was permitted to, and that resulted in the second part of his confession, also quoted above.

Appellant testified himself and introduced the testimony of two other witnesses—Lois Anderson and Dr. Joel Podolsky.

Appellant testified in great detail as to the circumstances of his arrest and the conditions of his confinement. He remembered where and when he was arrested and who was arrested with him. Notes of Testimony Pretrial Hearing # 1 at 60–62. He recalled in detail certain acts by the police designed to elicit information from him. *Id.* at 64–65. He said that the police removed all of his clothes and gave him only a smock to wear. *Id.* at 66. He also said that he "asked at every chance" to call his attorney. *Id.* Appellant admitted having seen Detective Matz but denied that it was at his request, *id.* at 67, and said that his recollection of the crucial events that followed was weak, *id.* at 68. He said that he told Detective Matz after the completion of the question and answer session that the typewritten answers did not reflect "what [he had been] talking about," *id.* at 69, and that Detective Matz then encouraged him to supplement the answers with a personal statement. Of this statement appellant spoke only in the most general fashion:

> [E]ventually somehow I got to the typewriter and I tried to type something, and I was trying to type. Whatever I was trying to type, I don't know what I was trying to type. When I was finished with it, I couldn't get any sense out of it. My thoughts in my head were fleeting and I just—just nothing seemed right. Nothing seemed normal. Nothing seemed to make any sense to me.

*Id.* at 69.

Appellant explained that the cause of his poor recollection and confused state of mind was that he was suffering from hallucinations caused by a "flashback" induced by coffee he drank when talking to Detective Matz. He also said that before his arrest he drank a lot of alcohol. *Id.* at 71–73.

Lois Anderson, an assistant public defender, testified that she spoke to appellant on March 10, 1977, and that he said he wanted a specific attorney to represent him and refused to be represented by a member of the public defender's office unless he could choose the attorney who would represent him. In this regard, the record discloses that on March 18, 1977, appellant notified the district attorney's office that he intended to represent himself.

Dr. Joel Podolsky testified, as he later did at trial, that appellant had a "paranoid personality at th[e] time [he confessed and was] closely on the border line of paranoid schizophrenia." Notes of Testimony Pretrial Hearing # 2 at 18. Dr. Podolsky offered the following observation on appellant's capacity to understand his *Miranda* rights.

I think he was compelled in this paranoid state that he was in—one can still remain somewhat realistic in knowing the surroundings about themselves and yet be in such a mental condition that one is compelled to give just continual—their continual distorted ideas of things and to not really understand what they are saying, to not know the legal rights in this. So, I don't feel that Mr. Neely understood his legal rights regarding this, understanding in the way of—that, you know, his meaning to him at that time was distorted.

*Id.* at 17.

On cross-examination Dr. Podolsky said:

Q. Are you telling us, Doctor too, that he did not understand the words of the *Miranda* warning?

A. He may have heard the words, I don't know what they meant to him at that time.

344

Q. Are you suggesting that he cannot and could not understand the phrase, "You have a right to remain silent and not answer any questions?"

A. He could—he could have heard the words. I don't know how it registered in his—in his mind.

Q. But you are not suggesting he didn't know what those words meant?

A. I'm suggesting I don't know how it registered in his—in his mind.

*Id.* at 21.

█ We think this record adequately supports the suppression court's findings that appellant knowingly waived his *Miranda* rights and voluntarily confessed. Certainly, the suppression court was entitled to reject appellant's testimony and accept Detective Matz's testimony to the effect that the confession was not coerced but given at appellant's initiative. *See Commonwealth v. Butch, supra.* The record therefore supports the court's finding that appellant voluntarily confessed. Whether appellant knowingly waived his *Miranda* rights is less certain, but we think it sufficiently shown.

█ While the second part of appellant's confession may disclose an irrational mind—a conclusion given support by Dr. Podolsky's testimony—this fact alone does not mean that appellant's waiver was unknowing. A defendant may be suffering from a mental illness and still be capable of waiving his constitutional rights. Thus, in *Commonwealth v. Tucker*, 461 Pa. 191, 335 A.2d 704 (1975), the Supreme Court found that a defendant who was diagnosed as a "constitutional psychopath" with a low I.Q. was nonetheless capable of waiving his constitutional rights and making a voluntary confession. The Court noted that whatever the defendant's mental infirmities he was able to provide "coherent and rational" testimony during the suppression hearing. *Id.*, 461 Pa. at 196–97, 335 A.2d 704.

█ A knowing waiver requires that the defendant know of his rights before he acts to forgo their protection. *See*

*Miranda v. Arizona,* 384 U.S. 436, 467–79, 86 S.Ct. 1602, 1624–30, 16 L.Ed.2d 694 (1966). It does not require that in deciding to waive his rights he act wisely or even that he be motivated by good reasons. Here, Dr. Podolsky's testimony was that appellant was suffering from a mental illness that distorted his perception of reality. It did not establish that appellant was unable to understand his rights and that he was waiving them.

Moreover, other aspects of the record support the suppression court's finding of a knowing waiver. The testimony of Lois Anderson demonstrated that two days after he made his statements, appellant was still refusing the assistance of counsel. His subsequent attempt to proceed *pro se* further indicates that his decision to waive his right to an attorney was not because he did not understand that right but rather because he believed—perhaps because of his distorted view of reality—that he would be better served if he represented himself. Similarly, appellant's own testimony at the suppression hearing reveals that despite his mental illness, he was capable of understanding questions put to him and of formulating coherent answers to those questions.

–3–

Appellant also argues that he is entitled to a new trial because the lower court refused to sever the trial on the charge of former convict not to own a firearm from the trial on the other charges. We agree.

In *Commonwealth v. Carroll,* 275 Pa.Superior Court 241, 418 A.2d 702 (1980), we held that the trial on a charge of former convict not to own a firearm must be severed from the trial on other charges. We said:

> We feel there is no question that appellant was prejudiced in this case. The crime of "Former convict not to own a firearm," requires the Commonwealth to show a previous conviction for a violent crime. Thus, where these charges are brought with others, clearly the jury is exposed to the fact that this particular defendant had previously committed a violent crime.

Normally, in criminal trials, evidence of prior crimes committed by a particular defendant is not admissible and any reference to it constitutes reversible error. *Commonwealth v. Martin*, 479 Pa. 63, 387 A.2d 835 (1978). The purpose of this rule is to prevent the conviction of an accused for one crime by the use of evidence that he has committed other unrelated crimes, and to preclude the inference that because he has committed other crimes, he was more likely to commit that crime for which he is being tried.

*Id.*, 275 Pa.Superior Ct. at 244, 418 A.2d at 704.

Accordingly, unless evidence of prior criminal conduct is otherwise admissible—for instance, to prove intent, identity, motive, or a common scheme—a trial court should grant a defendant's motion to sever the charge of former convict not to own a firearm from the other charges.

The Commonwealth does not suggest that the evidence of appellant's prior convictions of burglary, larceny, and receiving stolen property was in any way relevant to its proof that appellant committed aggravated assault and attempted robbery. Instead it argues that *Carroll* should not be followed in deciding this case because it "was not made retrospective." Brief for Commonwealth at 3. The argument is without merit. It is true that *Carroll* had not been filed when this case was tried. *Carroll* did not, however, make new law but applied settled principles. It therefore applies to this case, and to all cases still to be tried or tried but pending on appeal when it was filed; no issue of retrospective effect is presented. *Tice v. Nationwide Life Insurance Co.*, 284 Pa.Superior Ct. 220, 230, 425 A.2d 782, 788 (SPAETH, J., concurring) (1981); *Commonwealth v. Williams*, 232 Pa.Superior Ct. 339, 331 A.2d 875 (1974).

In support of its denial of appellant's motion to sever, the lower court relied on *Commonwealth v. Lowry*, 260 Pa.Superior Ct. 454, 394 A.2d 1015 (1978), but that case is not in point. There we only held that on a charge of former convict not to own a firearm the Commonwealth was required to prove, as a necessary element of the offense, the

defendant's prior conviction, and that it could do so by testimony by the Clerk of Courts, to prove the record of the conviction, and by the arresting officer and parole officers, to prove the identity of the person convicted. We did not consider whether the charge should on motion be severed from other charges.

The lower court's error in refusing to grant appellant's motion to sever would not necessitate a new trial if the error was harmless. Error is harmless, however, only if harmless beyond a reasonable doubt. *Commonwealth v. Story,* 476 Pa. 391, 383 A.2d 155 (1978). Here, that standard is not satisfied. For the evidence that appellant had been convicted of burglary, larceny, and receiving stolen property might have prejudiced appellant's defense of insanity. Or to state it conversely: it cannot be said beyond a reasonable doubt that the evidence did not prejudice the defense.

In Pennsylvania legal insanity is defined by the M'Naghten Rule. *See Commonwealth v. Roberts,* 496 Pa. 428, 437 A.2d 948 (1981); *Commonwealth v. Green,* 493 Pa. 409, 426 A.2d 614 (1981). The M'Naghten Rule is that a defendant is not criminally responsible if at the time he committed an otherwise criminal act, he was "laboring under such defect of reason, from disease of mind, as not to know the nature and quality of the act he was doing; or, if he did wrong, that he did not know he was doing wrong ...." *M'Naghten's case,* 8 Eng.Rep. 718 (1843). If a defendant introduces evidence of insanity, the Commonwealth must prove sanity beyond a reasonable doubt. *Commonwealth v. Tyson,* 485 Pa. 344, 402 A.2d 995 (1979); *Commonwealth v. Vogel,* 468 Pa. 438, 364 A.2d 274 (1976). Thus, before the jury could properly convict appellant it had to be satisfied, beyond a reasonable doubt, not only that appellant committed the proscribed *actus reus,* but also that when he did, he possessed the requisite *mens rea,* which is to say, that he was not "laboring under such defect of reason, from disease of mind," as not to know the nature and quality of his act, or, if he did, that it was wrong.

Here the jury was provided with considerable evidence regarding appellant's mental state: The testimony of Eddie Howard and Dr. Podolsky and the contents of appellant's written statement tended to show that when appellant attacked John Pearson, he was laboring under a defect of reason within the M'Naghten Rule. It was therefore the Commonwealth's burden to prove that despite this evidence, appellant possessed the requisite *mens rea*. The Commonwealth attempted to sustain its burden by introducing the testimony of Detective Matz concerning appellant's behavior several hours after the crime. This was a proper procedure. For if accepted by a jury, lay testimony may overcome expert testimony and be sufficient to sustain the Commonwealth's burden. *See Commonwealth v. Green*, 493 Pa. 409, 426 A.2d 614 (1981); *Commonwealth v. Tyson, supra; Commonwealth v. Demmitt*, 456 Pa. 475, 321 A.2d 627 (1974). The difficulty is that in deciding whether the Commonwealth had sustained its burden, the jury might have been prejudiced against appellant. It might have concluded that because appellant had already been convicted of crimes, he had a criminal disposition, and from that premise, have reasoned that he therefore possessed a *mens rea* at the time he attacked John Pearson. It is of course possible that despite the evidence of appellant's prior convictions the jury appraised the evidence without prejudice to appellant. But we cannot be sure of that beyond a reasonable doubt.

As regards appellant's conviction of former convict not to own a firearm, however, the case is quite different. On this charge appellant's criminal record was a necessary element of the offense. Thus, the Commonwealth was not only entitled but required to prove appellant's prior convictions. *Commonwealth v. Lowry, supra.* Evidence of the convictions was therefore admissible despite the fact that it may have prejudiced appellant's defense of insanity.[2]

2. Appellant also contends that he is entitled to a new trial on all the charges because the lower court abused its discretion by admitting in evidence a physician's testimony that John Pearson was unable to

The judgment of sentence for former convict not to own a firearm is affirmed. The judgments of sentence for attempted robbery and aggravated assault are vacated, and those cases are remanded to the lower court for new trial.

testify at trial. The basis for appellant's objection is that the physician had last examined Pearson *three or four months before trial.* Brief for Appellant at 11. This argument is without merit, for the physician testified that Pearson's comatose condition precluded his ability to testify and that there would be "no or very slight further improvement." N.T. 56–58.