STATE OF WEST VIRGINIA

*v.*

EUGENE PAUL CLAWSON

(No. 14070)

Decided September 23, 1980.

*Edward Friend II* for plaintiff.

*Chauncey H. Browning,* Attorney General, *Frances W. McCoy,* Assistant Attorney General, for defendant.

MILLER, JUSTICE:

In November, 1977, we granted this appeal to the defendant, Eugene Clawson, on two first degree murder convictions rendered in the Circuit Court of Monongalia County. Full argument was heard on March 11, 1980, with the defendant asserting multiple errors. The first relates to the admission of one of his confessions as to which he claims he did not initially waive his right to have counsel present. Collateral to this is the further claim that certain statements made at the time he was taken to an area where part of the crime was committed should not have been admitted without first determining in an *in camera* hearing if they were voluntary.

Another error assigned is that certain photographs of the bodies of the two victims of the crime should not have been admitted as they were extremely gruesome, highly imflammatory and lacking in probative value. He also contends the trial court erred in refusing his motion for a change of venue. The final ground is that expert testimony relating to hair samples was inadmissible.

The crime had its origin on the evening of January 18, 1970, when two female students at West Virginia University were seen accepting a ride from a passing automobile on a street in Morgantown where they had been hitchhiking. Their failure to return to their dormitory rooms was reported to local authorities. Efforts to trace them were not successful until certain items of personal property belonging to the victims were discovered along the roadside of Route 119 between Morgantown and Grafton. This resulted in an extensive search of a nearby wooded area located some distance from Goshen Road which intersects with Route 119. The bodies of the students were discovered in a shallow grave on April 16, 1970. Both bodies were decapitated and their heads have never been located.

The homicides remained unsolved until January of 1976 when law enforcement officials in Camden, New Jersey, contacted West Virginia police officials that the defendant, who was being held on other charges, was prepared to confess to the crime. A representative of the West Virginia State Police and a Morgantown police detective went to New Jersey where in cooperation with the New Jersey authorities a detailed confession was obtained from the defendant by way of questions and answers taken down by a court reporter.

On January 16, 1976, three days after this confession, the defendant was brought to the Morgantown area where an attempt was made to have him locate the area in which he claimed he had disposed of the victims' heads. The defendant lead investigators to a hillside near Point Marion, Pennsylvania, where an opening was discovered leading into some abandoned mine passage-

ways. These were explored but neither the heads nor the gun, that the defendant claimed he threw in the opening along with the heads, could be found. The authorities did, however, find some strands of human hairs in several animal nests located in one of the underground passages.

On February 17, 1976, West Virginia officials again travelled to New Jersey to further interrogate the defendant regarding aspects of his first confession that conflicted with the independent information that the officers had obtained in their effort to corroborate that confession. This second confession was taken in the presence of his counsel.[1]

The defendant furnished further incriminating statements in a letter written February 21, 1976, which he mailed while in jail in New Jersey to one of the West Virginia State police investigators in which he reasserted his responsibility for the offense.

## I. *The Confessions*

At trial the defendant's counsel sought to have defendant's first confession of January 13, 1976, held inadmissible on the ground that the defendant had not clearly and unequivocally waived his right to have counsel present at the time the confession was taken.

During the *in camera* hearing on the suppression motion, the State offered testimony of three witnesses who were present in New Jersey at the time the defendant's confession was taken. Two of the witnesses were police officials, Detective McCabe from the Morgantown Police and Trooper Shade of the West Virginia State Police. The third was Allen Lesky, a certified court reporter from New Jersey.

Both of the police officials testified that prior to taking the defendant's formal statement before the court re-

---

[1] The defendant's New Jersey counsel was a member of the Public Defender's Office and was defendant's counsel on the charges filed against him in New Jersey.

porter, they had talked to him for about an hour concerning the details of the crime. Before this questioning took place, both stated the defendant had been given his *Miranda* rights.[2] No written waiver of rights was obtained. The officers stated that the defendant agreed to waive his right to remain silent and his right to have counsel. The defendant at the *in camera* hearing did not challenge these facts.

The controversy arises over the next step in the interrogation when the defendant's formal statement was obtained before the court reporter. At the beginning of this proceeding, the defendant was again given his *Miranda* rights. It was during the course of this dialogue that the defense attorneys contend that defendant evidenced a desire for counsel and was talked out of the request.[3] In consequence the defendant's attorneys

[2] A copy of the New Jersey statement of rights was read into the record:

"Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent. Anything you say can and will be used against you in court or other proceedings. You have the right to consult an attorney before making any statements or answering any questions, and you may have him present with you during questioning. You may have an attorney appointed by the Court to represent you, if you cannot afford or otherwise obtain one. If you decide to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time or to stop the questioning for the purposes of consulting an attorney. However, you may waive the right to have counsel and your right to remain silent and you may answer questions or make statements without consulting a lawyer, if you so desire."

[3] This preliminary portion of the defendant's confession is:

"Q Now, Gene, before we go any further, I want to read your rights to you. Now, you know a short while ago we verbally interviewed you and you were given your rights. I read them to you off a card.

"A Yes.

"Q I want to read them to you again so there's no misunderstanding. Before we ask you any questions, it is my duty to advise you of your rights. You have the right to remain silent; anything you say can and will be used against you in court or other proceedings. You have the right to consult an attorney before making any statements or answering any questions, and

claim that no valid waiver of his right to counsel was obtained and the confession should not be admitted. The defense counsel also points to the fact that the interrogation started around 10 p.m. in the evening and the formal statement did not begin until approximately 11:40 p.m. Counsel suggests that the lateness of the

you may have him present with you during questioning. Do you understand that?

"A Yes.

"Q Did you understand the other two questions I asked you?

"A Yes.

"Q You may have an attorney appointed by the court to represent you if you cannot afford or otherwise obtain one. Do you understand that?

"A Yes.

"Q If you desire to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting a lawyer. Do you understand that?

"A Yes.

"Q However, you may waive your right to the advice of counsel and your right to remain silent and you may answer questions or make a statement without consulting a lawyer, if you so desire. Do you understand that?

"A Yes.

"Q Now, do you want to give us a statement, Gene?

"A Yes.

"Q Without your attorney?

"A Yes.

"Q Now, Gene, you are presently in the Camden County Prison; is that correct?

"A Camden County Jail.

"Q All right. I want it on the record that I am not going to question you at all about the charge that you are presently incarcerated for. I'm not going to question you about any other crimes that you may or may not have committed. I'm only going to concern outselves with the death of two young females in Morgantown, West Virginia on January the 18th, of 1970. Now, you are represented by an attorney on your present charge; is that correct?

"A Yes.

"Q Would you tell the court stenographer what his name is?

"A His name is — I don't know his first name. It's Mr. Weitzman. I can't spell it.

"Q And you got him through the Public Defender's Office?

"A Yes.

hour was deliberately planned by the officers in order to frustrate or coerce the defendant into waiving his right to counsel.

The State argues, however, that the defendant was fully informed of his right to remain silent and the right to counsel at the initial oral interrogation. The State points to the fact that at the *in camera* hearing the defendant did not offer any contrary evidence.

In *Massiah v. United States*, 377 U.S. 201, 12 L.Ed.2d 246, 84 S.Ct. 1199 (1964), and *Escobedo v. Illinois*, 378

---

"Q Do you want Mr. Weitzman here with you tonight?
"A He won't come this late at night. I don't have his phone number.
"Q Would you want him here tonight?
"A I would like to have him, because I trust him very much.
"Q You would like to have him?
"A It don't matter.
"Q Well, it matters, Gene. We want to take a statement from you.
"A I don't want to cause no inconvenience.
"Q We're not talking about inconvenience. It's a matter of your rights. Now, he represents you on the other case. We're not going to talk about the other case. We're not going to talk about the rape, if that's what you're afraid of.
"A I'm not afraid.
"Q We're only going to talk about this Morgantown homicide. Do you want to give us this statement without your attorney here?
"A I'll give it to you. I don't want to drag him down here, because I mean — it don't matter. I already gave the statement to him without him being here, so it doesn't matter now.
"Q What you're saying is we have been talking for about an hour now?
"A Yes.
"Q You were given your rights before?
"A Yes.
"Q It was asked at that time if you wanted your attorney and you said no?
"A Yes.
"Q At that time you didn't want him and you verbally told us everything that took place?
"A Yes.
"Q Now, is it your desire to give us this statement without your attorney?
"A Yes."

U.S. 478, 12 L.Ed.2d 977, 84 S.Ct. 1758 (1964), the Supreme Court established a defendant's Sixth Amendment right to counsel in a criminal case. *Massiah* dealt with the Government's interrogation of the defendant after he had been indicted and obtained counsel and ruled his inculpatory statements to be inadmissible. *Escobedo* held that the right to counsel applied at the time of a custodial criminal interrogation.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), the Court elaborated on the constitutional right to have the assistance of counsel and to be informed of this right, and held that custodial questioning could not begin unless the defendant waived his right to counsel.[4] *Miranda* made the following two statements. The first dealt with the accused's assertions of his right to counsel and the second related to proof of the waiver of the right to counsel:

> "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." 384 U.S. at 474, 16 L. Ed.2d at 723, 86 S.Ct. at 1628.

\* \* \* \* \* \* \*

> "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), dealt with the defendant's right to counsel with regard to the accused's Fifth Amendment right against self-incrimination. As the Supreme Court has indicated in *Rhode Island v. Innis*, 446 U.S. 291, 64 L.Ed.2d 297, 100 S.Ct. 1682 (1980), there may be a distinction between the Fifth and Sixth Amendment right to counsel in regard to criminal interrogations. *See*, Grano, *Rhode Island v. Inniss: A Need to Reconsider the Constitutional Premises Underlying the Law of Confessions*, 17 Am. Crim. L. Rev. 1 (1979); White, *Rhode Island v. Innis: The Significance Of A Suspect's Assertion of His Right to Counsel*, 17 Am. Crim. L. Rev. 53 (1979); Kamisar, *Brewer v. Williams, Massiah, and Miranda: What is "Interrogation"? When Does It Matter?* 67 Geo. L. J. 1 (1978). We need not address these distinctions since the defendant here was clearly in a custodial interrogation, when his first confession was obtained.

intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel. *Escobedo v. Illinois*, 378 U.S. 478, 490, note 14, 12 L.Ed.2d 977, 986, 84 S.Ct. 1758, 1765 note 14. This Court has always set high standards of proof for the waiver of constitutional rights, *Johnson v. Zerbst*, 304 U.S. 458, 82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357 (1938), and we reassert these standards as applied to in-custody interrogation." 384 U.S. at 475, 16 L.Ed.2d at 724, 86 S.Ct. at 1628.

In Syllabus Point 1 of *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979), we established, under our State constitution, this rule in regard to the effect of a request for counsel:

"When a criminal defendant requests counsel, it is the duty of those in whose custody he is, to secure counsel for the accused within a reasonable time. In the interim, no interrogation shall be conducted, under any guise or by any artifice. W. Va. Const. Art. 3, § 5 and W. Va. Const. Art. 3, § 14."

Much the same point was made in the first syllabus of *State v. McNeal*, 162 W. Va. 550, 251 S.E.2d 484 (1978):

"Once a suspect in custody has expressed his clear, unequivocal desire to be represented by counsel, the police must deal with him as if he is thus represented. Thereafter, it is improper for the police to initiate any communication with the suspect other than through his legal representative, even for the limited purpose of seeking to persuade him to reconsider his decision on the presence of counsel."

What is at issue in this case is whether there has been an appropriate waiver of the right to counsel by the defendant. The United States Supreme Court has recognized in *Brewer v. Williams*, 430 U.S. 387, 51 L.Ed.2d 424, 97 S.Ct. 1232 (1977), that even after counsel has been appointed, the defendant may make a knowing and intelligent waiver of his right to have counsel present when he makes an incriminating statement.

"The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not*, without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." 430 U.S. at 405-06, 51 L.Ed.2d at 441, 97 S.Ct. at 1243 (Emphasis in original).

The Supreme Court's approach in *Brewer* that there is no absolute rule against waiving the right to counsel, once counsel is sought or obtained, parallels its conclusion on the other important right settled in *Miranda* — that against self-incrimination. In *Michigan v. Mosley*, 423 U.S. 96, 46 L.Ed.2d 313, 96 S.Ct. 321 (1975), the court considered whether the *Miranda* stricture – "[i]f the individual indicates in any manner, at anytime prior to or during questioning, that he wishes to remain silent, the interrogation must cease," 384 U.S. at 473-74, 16 L.Ed.2d at 723, 86 S.Ct. at 1627 — should be made absolute in the sense that once the right against self-incrimination is invoked, it may not be waived later. As noted in *Mosley*, there are several possible literal interpretations to the quoted *Miranda* language. One is that questioning may be resumed after a momentary hiatus. Another is that questioning may never be resumed. The Supreme Court's conclusion was:

"It is evident that any of these possible literal interpretations would lead to absurd and unintended results. To permit the continuation of custodial interrogation after a momentary cessation would clearly frustrate the purposes of *Miranda* by allowing repeated rounds of questioning to undermine the will of the person being questioned. At the other extreme, a blanket prohibition against the taking of voluntary statements or a permanent immunity from further interrogation, regardless of the circumstances, would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity, and deprive suspects of an opportunity to make informed and intelligent assessments of their interests. Clearly, therefore, neither this passage nor any other passage in

the *Miranda* opinion can sensibly be read to create a per se proscription of indefinite duration upon any further questioning by any police officer on any subject, once the person in custody has indicated a desire to remain silent." 423 U.S. at 102-03, 46 L.Ed.2d at 320-21, 96 S.Ct. at 326.

*Brewer* addressed the waiver of counsel standard in the following terms:

"[I]t was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst*, 304 U.S. at 464, 82 L.Ed. 1461, 58 S.Ct. 1019, 146 A.L.R. 357. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant, *Carnley v. Cochran*, 369 U.S. 506, 513, 8 L.Ed.2d 70, 82 S.Ct. 884; cf. *Miranda v. Arizona*, 384 U.S. at 471, 16 L.Ed.2d 694, 86 S.Ct. 1602, 10 Ohio Misc. 9, 36 Ohio Ops. 2d 237, 10 A.L.R.3d 974, and that courts indulge in every reasonable presumption against waiver, e.g., Brookhart v. Janis, supra, at 4, 16 L.Ed.2d 314, 86 S.Ct. 1245, 7 Ohio Misc. 77, 36 Ohio Ops. 2d 141; *Glasser v. United States*, 315 U.S. 60, 70, 86 L.Ed. 680, 62 S.Ct. 457." 430 U.S. at 404, 51 L.Ed.2d at 439-40, 97 S.Ct. at 1242.

In its more recent holding in *North Carolina v. Butler*, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), the Court concluded that a specific waiver of *Miranda* rights was not necessary, but that a waiver could be implied from all of the circumstances surrounding the administration of the *Miranda* warnings and the defendant's conduct in relation to these warnings.

A distinction, however, must be made between *Brewer* and *Butler*. In *Brewer* the defendant already had counsel who had cautioned him not to discuss the crime with police officers who were transporting him to the city where the crime had been committed. The attorney had also advised the officers that they were not to instigate discussions with the defendant during the trip. During the journey, however, the officers brought up the crime

and were able to trigger inculpatory statements. In *Butler* the defendant did not have counsel and was given his *Miranda* warnings concerning his right to have counsel. The issue was whether he had intially waived his right to counsel.

It is apparent that where the evidence is undisputed that the defendant sought or obtained his right to counsel and the State obtains a confession after this admitted fact, the State's burden to show a subsequent waiver in the face of the defendant's acknowledged assertion of his right becomes exceedingly heavy. This burden is much more onerous than in the case where the initial issue is whether, after receiving his *Miranda* warning, the defendant voluntarily and intelligently waived his right.

The reason for this distinction rests on the basic concept of waiver of the *Miranda* rights. It is recognized in *Butler* and other cases that a waiver cannot be inferred from the defendant's silence in response to his *Miranda* warning. If this is true on the initial question of waiver, it must follow that where the defendant has initially asserted his right to counsel, then a subsequent waiver is even more difficult to establish, particularly in view of *Miranda's* prohibition against further probing or testing of the defendant's will where he has invoked his rights.

This is the distinction between *State v. Bradley*, 163 W. Va. 148, 255 S.E.2d 356 (1979), and our earlier cases of *State v. Mason*, 162 W. Va. 297, 249 S.E.2d 793 (1978); *State v. Bragg*, 160 W. Va. 455, 235 S.E.2d 466 (1977); and *State v. Plantz*, 155 W. Va. 24, 180 S.E.2d 614 (1971). In these earlier cases we dealt with the problem of whether the defendant had initially made a voluntary waiver of his *Miranda* rights where this factual issue was in dispute. In this situation the primary problem is to resolve the factual dispute and to determine whether the State has sustained its burden of showing the waiver. This point was summarized in *State v. McNeal*, 162 W.Va. 550, 251 S.E.2d 484, 487 (1978):

"[T]he burden is on the State to prove an intentional relinquishment or abandonment of a known right or privilege, *see e.g., Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 1247, 16 L.Ed.2d 314 (1966); *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct 1019,1023, 82 L.Ed. 1461, 1466 (1937); and ... courts indulge in every reasonable presumption against waiver. ..."

In *Bradley,* however, it was undisputed that the defendant had initially requested counsel on several occasions; yet, no timely efforts were made to obtain counsel for him. Two days after his request for counsel, he was confronted by hostile media employees while returning from a magistrate office in custody of the police, and at this point made some inculpatory statements to the police. In holding these statements to be inadmissible because of the defendant's undisputed prior request for counsel, we stated:

"If after requesting counsel an accused shall recant his request before a lawyer can reasonably be secured, the heavy burden of the government to prove waiver *(Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), also, *Commonwealth v. Nathan,* 445 Pa. 470, 285 A.2d 175 (1971)) is even heavier. It can best be borne by a written statement, signed by the defendant, affirming his relinquishment of his theretofore asserted constitutional rights. Only then can interrogation proceed, absent counsel." 255 S.E.2d at 358.

A further legal question in connection with the present confession is the effect to be given to the fact that at the time the confession was taken the defendant already had counsel appointed on the unrelated crime that he had committed in New Jersey. Most courts which have considered this question have held that the fact that the defendant has counsel on an unrelated charge does not preclude police officials from obtaining a waiver of counsel for the present interrogation without notice to counsel appointed on the unrelated charge. *E.g., Government of Canal Zone v. Sierra,* 594 F.2d 60

(5th Cir. 1979); *United States v. Brown*, 569 F.2d 236 (5th Cir. 1978); *United States v. Hall*, 523 F.2d 665 (2nd Cir. 1975); *United States v. Crook*, 502 F.2d 1378 (3rd Cir. 1974); *cert. denied*, 419 U.S. 1123, 42 L.Ed.2d 823, 95 S.Ct. 808 (1975); *State v. Richmond*, 114 Ariz. 186, 560 P. 2d 41 (1977), *cert. denied*, 433 U.S. 915, 53 L.Ed.2d 1101, 97 S.Ct. 2988; *Rutledge v. State*, 263 Ark. 781, 567 S.W.2d 283 (1978).

Indeed many courts do not appear to differentiate between the standard for waiver of counsel where the defendant has counsel on the charge which is the subject of the pending interrogation and where counsel exists on an unrelated charge. *United States v. Cobbs*, 481 F.2d 196 (3rd Cir. 1973), *cert. denied*, 414 U.S. 980, 94 S.Ct. 298, 38 L.Ed.2d 224; *United States v. Springer*, 460 F.2d 1344 (7th Cir. 1972), *cert. denied*, 409 U.S. 873, 34 L.Ed.2d 125, 93 S.Ct. 205; *Moore v. Wolff*, 495 F.2d 35 (8th Cir. 1974); *State v. McLucas*, 172 Conn. 542, 375 A.2d 1014 (1977); *People v. Aldridge*, 79 Ill.2d 87, 402 N.E.2d 176 (1980); *Lamb v. Commonwealth*, 217 Va. 307, 227 S.E.2d 737 (1976).

There is a need for such a differentiation. Where the defendant has sought or obtained counsel on a pending charge, it is apparent that he has initially exercised his right to counsel and waiver is not an issue. If *Massiah* and *Miranda* and their progeny are to have any meaning, the State should not be permitted to make subsequent overtures to the defendant to see if he wishes to abandon his already exercised right to counsel. To permit the State to subsequently test the defendant's resolve to have counsel by importuning him to waive counsel is to enable the State to wear away at the defendant in the hope of having him recant his earlier decision to have counsel.[5]

---

[5] Some courts have considered this problem in terms of unethical conduct on the part of the government's attorney and, by extension, on the part of its investigative agents, who attempt to interview a defendant after he has obtained counsel. *United States v. Crook, supra; United States v. Thomas*, 474 F.2d 110 (10th Cir. 1973), *cert. denied*, 412 U.S. 932, 37 L.Ed.2d 160, 93 S.Ct. 2758;

This restriction does not mean that the defendant may not voluntarily decide to recant his right to counsel but any reconsideration must occur independently of overtures from the State. Under *Bradley* the State will bear an even heavier burden to show a voluntary waiver or recantation following an assertion of the right to counsel.

On the other hand, where counsel has been obtained on an unrelated charge, this fact has no particular bearing on whether the defendant is willing to waive counsel on the present charge. It cannot be said from either a constitutional or ethical standpoint that because a defendant has counsel on one criminal charge, the State is thereby foreclosed from making contact with the defendant on another matter. *Government of Canal Zone v. Sierra,* 594 F.2d 60 (5th Cir. 1979); *State v. Richmond,* 114 Ariz. 186, 560 P.2d 41 (1977); *Rutledge v. State,* 263 Ark. 781, 567 S.W.2d 283 (1978); *State v. Sahlie,* 277 N.W.2d 591 (S.D. 1979). The essential point is whether the defendant desires to have counsel on the present charge or whether he will voluntarily waive that right.

This decision is one that necessarily relates to the defendant's state of mind in regard to the present charge and we cannot conclude that an earlier decision to have counsel on an unrelated charge can be automatically assumed on the subsequent charge. Moreover, the State is still required before interrogation to give the defendant his *Miranda* warnings so that he may at this point make the decision to have counsel on the separate charge. To hold that his prior decision to have counsel on an unrelated charge forecloses further inquiry with the defendant on the new charge would result in an absolute presumption against waiver from a prior collateral occurrence. Apparently only one court has held that a defendant's retention of counsel on an unrelated charge forecloses the State from undertaking interroga-

United States v. Four Star, 428 F.2d 1406 (9th Cir. 1970), *cert. denied,* 400 U.S. 947, 91 S.Ct. 255, 27 L.Ed.2d 253. Code of Professional Responsibility DR 7-104.

tion of the defendant on a separate charge without notice to his counsel. *People v. Rogers*, 48 N.Y.2d 167, 397 N.E.2d 709, 422 N.Y.S.2d 18 (1979).

In reviewing the circumstances of the present case under the foregoing law, we are of the view that the fact that the defendant had court-appointed counsel on the unrelated New Jersey charge did not preclude the State from interrogating him on the West Virginia murder charges.

The initial oral interrogation was preceded by his *Miranda* warnings which the defendant acknowledges and whereby he expressly waived his right to remain silent and his right to have counsel. When the defendant was subsequently interrogated before the court reporter, he was again given his *Miranda* warnings and agreed to waive his right to remain silent and to have counsel.[6]

It was not until the interrogator brought up the fact that the defendant had a lawyer on the unrelated New Jersey charge and that the interrogation would not involve the New Jersey charge and specifically asked if

---

[6] The entire transcript of the waiver of rights is set out in Note 3, *supra*. It is clear from the following portions that the inquiry in regard to waiver of the right to counsel was more than perfunctory:

"Q You may have an attorney appointed by the court to represent you if you cannot afford or otherwise obtain one. Do you understand that?
"A Yes.
"Q If you desire to answer questions now with or without a lawyer, you still have the right to stop the questioning at any time or stop the questioning for the purpose of consulting a lawyer. Do you understand that?
"A Yes.
"Q However, you may waive your right to the advice of counsel and your right to remain silent and you may answer questions or make a statement without consulting a lawyer, if you so desire. Do you understand that?
"A Yes.
"Q Now, do you want to give us a statement, Gene?
"A Yes.
"Q Without your attorney?
"A Yes.

the defendant wanted this lawyer present that the defendant first indicated a desire to have counsel. In view of the defendant's previous unequivocal willingness to waive his right to counsel, we cannot conclude that his subsequent responses were without ambiguity such that the interrogator was required under *Miranda* to close any further explanation of the issue of whether the defendant was willing to waive his right to counsel. The courts that have dealt with this issue have held that where the defendant is equivocal in whether he desires to exercise his right to counsel, further questions may be asked in order to clarify his position. *Nash v. Estelle*, 597 F.2d 513 (5th Cir. 1979), *cert. denied*, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409; *United States v. Rodriquez-Gastelum*, 569 F.2d 482 (9th Cir. 1978), *cert. denied*, 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760; *United States v. Riggs*, 537 F.2d 1219 (4th Cir. 1976); *Smith v. State*, 397 N.E.2d 959 (Ind. 1979); *State v. Smith*, 588 S.W.2d 27 (Mo. App. 1979).

Here, we believe that the equivocation arises not simply because the defendant had on several prior occasions expressed a clear and unequivocal willingness to waive his right to counsel, but also because when he was asked if he wanted his attorney his response was equivocal, to the effect that "He won't come this late" and "I don't have his phone number". In reaching this conclusion, we rely not only on the dialogue developed at the time the transcript of the first confession was taken but also on the testimony of the officials present at the taking of the confession who testified at the *in camera* hearing as to the defendant's demeanor and willingness to waive his right to counsel. In summary, we do not believe the trial court erred in ruling the first confession to be voluntary.[7]

---

[7] We are also influenced by the fact that on February 17, 1976, the defendant gave a second confession in the presence of his New Jersey counsel. While objection was made at trial to this confession and to the inculpatory letter written by the defendant on February 21, 1976, to Major Hall of the West Virginia State Police, the trial court was clearly correct in holding them to be voluntary. Defend-

Defendant further contends that certain statements made by him to police officers, while he accompanied them on a visit to the Morgantown area three days after his first confession, were inculpatory and should not have been admitted without an *in camera* hearing to determine their voluntariness. This point was not raised below. We have held at least since *State v. Fortner*, 150 W. Va. 571, 148 S.E.2d 669 (1966), that it is the mandatory duty of the trial court, whether requested or not, to make an *in camera* determination of the voluntariness of the defendant's inculpatory statements before they can be presented in evidence. The latest affirmation of the *Fortner* principle was given by Justice Neely in *State v. Tomey*, 163 W. Va. 578, 259 S.E.2d 16, 17 (1979),[1] where he stated:

> "Since our decision in *State v. Fortner*, 150 W. Va. 571, 148 S.E.2d 669 (1966), a hearing on the voluntariness of a confession has been mandatory, whether or not it was requested."

*See also State v. Lamp*, 163 W. Va. 93, 254 S.E.2d 697, 698-699 (1979); *State v. Sanders*, 161 W. Va. 399, 242 S.E.2d 554, 556 (1978); *State v. Johnson*, 158 W. Va. 682, 226 S.E.2d 442, 445 (1976); *Spaulding v. Warden*, 158 W. Va. 557, 212 S.E.2d 619, 624 (1975); *State v. Plantz*, 155 W. Va. 24, 36, 180 S.E.2d 614, 622 (1971).

Because this case is reversed on the ground set out in the next section, we need not extensively consider this point except to make the following observations. First, where there is a failure to hold an *in camera* hearing on the defendant's inculpatory statements, we recognize under *Jackson v. Denno*, 378 U.S. 368, 12 L.Ed.2d 908, 84 S.Ct. 1774 (1964), that the case will not be reversed for a new trial on this basis alone. Instead, it will be remanded for a voluntariness hearing before the trial court. *See State v. Lawson*, ___ W. Va. ___, 267 S.E.2d 438, 439-40 (1980); *State v. Brewster*, ___ W. Va. ___, 261 S.E.2d 77,

---

ant makes no assignment of error as to this ruling. Both of these inculpatory statements covered much the same material contained in the first confession.

82-83 (1979). If the trial court finds the statements are voluntary the verdict will stand. If, on the other hand, he finds the statements to be involuntary, the verdict will be set aside unless the trial court determines that this constitutional error is harmless beyond a reasonable doubt.[8]

## II. Admissibility of Photographs

The defendant asserts that the trial court committed reversible error when it admitted ten color photographs of the victims' bodies as they appeared on the pathologist's autopsy table. The defendant argues that these photographs were not relevant to a single issue that was disputed in the case and served only to prejudice and inflame the jury.

All ten of the autopsy pictures admitted were 8″ x 10″ color glossy prints. The first seven photographs comprise exhibits 5A to 5G and portray the body of the victim who was found in the upper portion of the grave. The remaining three photographs, exhibits 6A-6C, are of the body of the second victim, who was found in the lower portion of the grave.

It is difficult to describe a scene as gruesome as that depicted in these photographs. For three months these human remains had lain in the forest decomposing. The flesh over much of the body in Exhibit 5 is torn and missing. The investigators at trial suggested the flesh was eaten away by animals. Exhibit 5A portrays the body as it appeared when delivered to the autopsy room, clothed in blood-soaked garments. The right leg contains remnants of flesh and tattered clothing that taper to the point where the lower leg is eaten to bare bone. The

---

[8] This is the federal standard of harmless error utilized in *Milton v. Wainwright*, 407 U.S. 371, 33 L. Ed.2d 1, 92 S.Ct. 2174 (1972), to insulate a bad fourth confession where there were three prior good confessions admitted. We have adopted the same general standard for harmless constitutional error. *State v. Vance*, ___ W. Va. ___, 262 S.E.2d 423, 431 (1980); *State v. Boyd*, 160 W. Va. 234, 233 S.E.2d 710, 717-18 (1977); *State v. Britton*, 157 W. Va. 711, 203 S.E.2d 462, 467 (1974).

right foot is missing altogether. Exhibit 5C is a color close-up of the same view with the clothing removed.

Exhibits 5B and 5D are close-up photographs of the headless torso, clothed only in a brassiere. The photographs are centered on the severed neck in a view through the opening of the wound into the partially hollowed chest cavity. The remaining three photographs in Exhibit 5 are post-autopsy photographs, after the chest cavity had been sawed apart and the remaining internal organs removed. The pictures are color close-ups of the dried and decomposed remnants of the disemboweled pelvic region.

The three photographs comprising Exhibit 6 portray a different, though equally gruesome condition. Since the victim in Exhibit 6 was found in the lower portion of the grave, the body, with the exception of the head, appears to be intact. The three photographs portray only the unclothed upper torso, in color close-ups of the headless shoulders. Although the skin is blood-soaked and discolored, it is unbroken so that the body fluids have been retained.

This Court recently discussed the problem of gruesome photographs in *State v. Rowe*, 163 W. Va. 593, 259 S.E.2d 26, 28 (W. Va. 1979), where we stated:

> "Gruesome photographs are not *per se* inadmissible. But the trial court must be satisfied that they are essential to the State's case. *See, e.g., People v. Garlick*, 46 Ill.App.3d 216, 4 Ill.Dec. 746, 360 N.E.2d 1121 (1977); *State v. Clark, supra; State v. Scott*, 337 So.2d 1087 (La. 1976); *State v. Partee*, 199 Neb. 305, 258 N.W.2d 634 (1977); *State v. Polk*, 164 N.J. Super. 457, 397 A.2d 330 (1977); *Commonwealth v. Ross*, 452 Pa. 500, 307 A.2d 898 (1973); *Commissioner v. Chacko*, 480 Pa. 504, 391 A.2d 999 (1978). They must have something more than probative value, because by the preliminary finding that they are gruesome, they are presumed to have a prejudicial and inflammatory effect on a jury against a defendant. The State

must show that they are of essential evidentiary value to its case."

It is apparent that the photographs in Exhibits 5 and 6 were not of essential evidentiary value. They depict nothing that was not otherwise thoroughly established by competent expert evidence. The defense did not dispute the existence of two decapitated bodies. Two pathologists testified in detail to the condition of the corpses. The state of the bodies after three months of decomposition and after autopsy procedures had been performed was such that there was no relevance to their condition at the time the crime was committed. The only practical effect of the photographs was the shock value of their grisliness.

The State suggests that *Rowe* changed our law in regard to the admissibility of gruesome photographs, and that since *Rowe* had not been decided at the time of the defendant's trial, it should not be applied. It may be true that prior to *Rowe* our law in regard to the admissibility of gruesome photographs did not contain some of the detailed standards set in *Rowe*. Even prior to *Rowe*, however, we required photographs to accurately depict the victim's condition at the time of the commission of the crime and to be relevant to some issue in the case. *State v. Wooldridge*, 129 W. Va. 448, 40 S.E.2d 899 (1946); *State v. Goins*, 120 W. Va. 605, 199 S.E. 873 (1938). Even if the photographs are tested by these modest standards, they would not be admissible.

The most obvious reason for their inadmissibility is the fact that they do not depict the condition of the victims at the time of the offense but some three months later after they had decomposed and had been eaten by wild animals. Even more appalling is that some of the photographs were taken after the chest cavity was cut apart by the pathologist and the internal organs were eviscerated. Courts have been almost universal in their condemnation of admitting photographs depicting the victim's body after it has been subject to autopsy procedures. *People v. Redston*, 139 Cal.App.2d 485, 293 P.2d

880 (1956); *People v. Landry,* 54 Ill.App.3d 159, 11 Ill.Dec. 588, 368 N.E.2d 1334 (1977); *People v. Jackson,* 9 Ill.2d 484, 138 N.E.2d 528 (1956); *Kiefer v. State,* 239 Ind. 103, 153 N.E.2d 899 (1958); *State v. Clark,* 218 Kan. 18, 542 P.2d 291 (1975); *State v. Morris,* 245 La. 175, 157 So.2d 728 (1963); *State v. Bischert,* 131 Mont. 152, 308 P.2d 969 (1957); *Commonwealth v. Eckhart,* 430 Pa. 311, 242 A.2d 271 (1968); *State v. Poe,* 21 Utah 2d 113, 441 P.2d 512 (1968). Other courts have held photographs to be inadmissible as excessively gruesome where the victim's body was mutilated by causes other than the crime or in a decomposed state when discovered. *Commonwealth v. Richmond,* 371 Mass. 563, 358 N.E.2d 999 (1976) (victim's face mutilated by dog after murder). *Commonwealth v. Liddick,* 471 Pa. 523, 370 A.2d 729 (1977) (photograph of decomposed body of victim pulled from lake).

The State argues that the photographs had some probative value in demonstrating that the bodies were so badly deteriorated and decomposed that it was impossible for the State's pathologist to determine if there was evidence of sexual molestation.[9] The State's pathologist had testified at some length about the badly decomposed condition of the body in the upper portion of the grave, but presented no testimony regarding evidence of sexual abuse to this body. The other body which was in a less deteriorated condition was found not to be sexually abused. The photographs that were presented, however, did not relate to this point since there were no photographs of the lower portion of this body. The basic point remains that there was no probative value to the photographs contained in Exhibits 5 and 6 since the bodies had been altered from the time of the commission of the crime. They were extremely gruesome and should not have been admitted.

[9] The lack of evidence of sexual molestation became an issue as part of the defense's attempt to discredit the confessions. The point brought out by the defense was that the confessions contain descriptions of sexual assault that the pathologists' examinations were unable to confirm.

Even under the harmless error rule in *State v. Atkins*, 163 W. Va. 502, 261 S.E.2d 55, 59 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), we cannot dismiss the introduction of the photographs as harmless. In Syllabus Point 2 of *Atkins* we summarized our nonconstitutional harmless error rule as follows:

> "Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury."

Following this formulation, we find that absent the pictures the State still had sufficient evidence to prove its case, but it cannot be said that the quality of the State's proof was overwhelming. This point was emphasized in *Atkins* when we stated, "If the case contains a number of substantial key factual conflicts ... there is an increased probability that the error will be deemed prejudicial." 163 W. Va. at 515, 261 S.E.2d at 63. *See also, State v. Haverty*, ___ W. Va. ___, 267 S.E.2d 727 (1980).

Although the State's case included several confessions from the defendant which were its strongest evidence, the confessions contained a number of factual inconsistencies with the physical evidence. These inconsistencies had caused two members of the West Virginia State Police, who had investigated the crime, to conclude that the defendant's confessions were fabrications. Their testimony tended to support the defendant's story that he had obtained the details in his confession from a magazine article published in the December 1975 issue of

*Detective Cases* entitled "The Case of the Headless Coeds" which described in some detail the results of the investigations surrounding the crime.[10]

The record demonstrates that the prosecution also utilized the photographs in closing argument. In the beginning portion of the State's closing argument the jury was shown Exhibit 5G which the State characterized as "a consumed evacuated hunk of flesh and bone." During the remaining portions of the State's closing arguments the jury was invited to view the photographs on several occasions.

The fundamental rationale barring the introduction of gruesome photographs is that their impact on the jury is such that it will become so incensed and inflamed at the horrible conditions depicted that it will not be able to objectively decide the issue of the defendant's guilt. This point has been frequently stated by other courts and perhaps best expressed by the Indiana court in *Kiefer v. State,* 239 Ind. 103, 153 N.E.2d 899, 905 (1958):

> "It is the duty of the State to present relevant and material facts to the jury to stimulate their mental processes so that they might thereby arrive at the guilt or innocence of the accused. But to introduce evidence only for the purpose of arousing the passions and prejudices of the jury, in such a manner as to cause them to abandon any serious consideration of the facts of the case and give expression only to their emotions, is

---

[10] A copy of this article was introduced as Defendant's Exhibit 4. His reasons for making the confession were stated by him at trial as follows:

"I made the confession because I had been sitting in the jail for two years and it was December '75 I read an article in two different magazines concerning the coed murders and I felt that if I, you know, if I could make the officials in West Virginia believe I was guilty and I could get indicted for it and brought down here, Jersey, due to the fact the charges down here were bigger than the ones I had in Jersey, Jersey would drop charges against me and then when I got down here I felt I could prove my innocence and then I wouldn't have no more time. That's why I did it."

> clearly outside the scope of such duty and a violation of an accused's right to a fair trial."

We conclude that the photographs designated as Exhibits 5 and 6 had no probative value and were clearly gruesome and their introduction created reversible error.

## III. Change Of Venue

Since this case must be reversed, the question of whether the defendant was entitled to a change of venue is not as significant since the motion may be renewed, if warranted, before the next trial. A few observations are perhaps worthwhile. In *State v. Sette*, 161 W. Va. 384, 242 S.E.2d 464 (1978), we discussed some of our principles surrounding the grounds for a change of venue. There, as here, the prosecutor had disclosed a considerable portion of his case to the media in advance of trial, which had given the disclosures widespread publicity. This practice violates the Code of Professional Responsibility, DR 7-107 which precludes both prosecution and defense attorneys from trying their case through the public media.[11]

---

[11] The relevant portion of DR 7-107 is subsection (B):

"(B) A lawyer or law firm associated with the prosecution or defense of a criminal matter shall not, from the time of the filing of a complaint, information, or indictment, the issuance of an arrest warrant, or arrest until the commencement of the trial or disposition without trial, make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by means of public communication and that relates to:

  (1) The character, reputation, or prior criminal record (including arrests, indictments, or other charges of crime) of the accused.

  (2) The possibility of a plea of guilty to the offense charged or to a lesser offense.

  (3) The existence or contents of any confession, admission, or statement given by the accused or his refusal or failure to make a statement.

  (4) The performance or results of any examinations or tests or the refusal or failure of the accused to submit to examinations or tests.

Both *Sette* and *State v. Dandy*, 151 W. Va. 547, 153 S.E.2d 507 (1967), as well as other of our cases[12], recognize that the right to a change of venue rests upon the defendant's showing that there exists in the community a present hostile sentiment against him. *Sette* suggests that widespread adverse publicity in the media would be a substantial factor in warranting a change of venue.[13] *Cf. State ex rel. Herald Mail Co. v. Hamilton*, ____ W. Va. ____, 267 S.E.2d 544 (1980).

A further factor that may be accorded some significance in *Sette* is that "almost fifty percent of the jurors summoned for jury duty were disqualified because they had formed a conclusion concerning the case which they were unable to discard." 242 S.E.2d at 468. *Compare Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), *with Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961). Here seven out of the original panel claimed disqualification, but the record does not disclose the precise reasons beyond the inference that they had formed an opinion. Obviously, where it is determined during voir dire that an unbiased jury panel cannot be assembled, a change of venue can be granted at this point. Double jeopardy does not attach until the

---

(5) The identity, testimony, or credibility of a prospective witness.

(6) Any opinion as to the guilt or innocence of the accused, the evidence, or the merits of the case."

[12] *E.g. Gangwer v. Black*, 162 W. Va. 943, 253 S.E.2d 538 (1979); *State v. Wilson*, 157 W. Va. 1036, 202 S.E.2d 828 (1974); *State v. Riley*, 151 W. Va. 364, 151 S.E.2d 308 (1966); *State v. Hamric*, 151 W. Va. 1, 151 S.E.2d 252 (1966); *State v. Siers*, 103 W. Va. 30, 136 S.E. 503 (1927).

[13] We discussed at considerable length the right to a voir dire examination of jurors in *State v. Pendry*, 159 W. Va. 738, 227 S.E.2d 210, 216 (1976), and stressed the fact that there may be those occasions when an individual voir dire of jurors would be appropriate. In *State v. Pratt*, 161 W. Va. 530, 244 S.E.2d 227, 232 (1978), we found that the failure to accord individual voir dire under the circumstances was reversible error. *State ex rel. Herald Mail Co. v. Hamilton*, ____ W. Va. ____, 267 S.E.2d 544, 550 (1980), recognized that one technique to ensure a fair trial where adverse publicity existed was to permit "a thorough and individual *voir dire* of the jury."

jury is empaneled and sworn. *Crist v. Bretz*, 437 U.S 28, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978); *Adkins v. Leverette*, ____ W. Va. ____, 264 S.E.2d 154 (1980); *Brooks v. Boles*, 151 W. Va. 576, 153 S.E.2d 526 (1967).

From the record, it is apparent that much of the change of venue problem was triggered by the prosecutor's divulging his case to the media in advance of trial. It is hoped that on the retrial such matters will not reoccur.

## IV. Admissibility of Hair Analysis

The State introduced testimony from a State Police chemist who testified about certain hair retrieved from animal nests that were located in an abandoned underground mine. The mine was beneath the crevice where the defendant allegedly threw the severed heads. The chemist performed a microscopic examination of these hairs in comparison with hair taken from a pocketbook and clothing belonging to the victims. He testified that the hairs contained some characteristics in common, although he was unable to form an opinion from his examination as to whether the nest hair was actually that of the victims. The defendant asserts that it was error to admit the chemist's testimony as to hair comparison in view of the fact that the chemist admitted that he did not possess sufficient known samples from the victims to give an ultimate opinion, based on a reasonable degree of scientific accuracy, that the hair samples found in the nest were the same as those taken from the personal possessions and clothing of the victims.

Part of the problem lies in the fact that the record does not adequately disclose the scientific basis for determining how comparison is made with regard to hair samples. We are aware that other courts have permitted expert testimony in regard to comparison of hair samples, but in these cases there was no question raised as to the absence of a sufficient quantity of known samples and consequently this point was not discussed. Most of the cases seem to assume that a sufficient scientific accuracy has been demonstrated and, without any ex-

tensive discussion of the evidentiary basis for admitting such testimony, hold that such testimony is admissible. *United States v. Brady*, 595 F.2d 359 (6th Cir. 1979), *cert. denied*, 444 U.S. 862, 100 S.Ct. 129, 62 L.Ed.2d 84; *United States v. Cyphers*, 553 F.2d 1064 (7th Cir. 1977), *cert. denied*, 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107; *United states v. Haskins*, 536 F.2d 775 (8th Cir. 1976), *cert. denied*, 429 U.S. 898, 97 S.Ct. 263, 50 L.Ed.2d 182; *People v. Allen*, 41 Cal.App.3d 196, 115 Cal.Rptr. 839 (1974); *Padilla v. People*, 156 Colo. 186, 397 P.2d 741 (1964); *People v. Di Giacomo*, 71 Ill.App.3d 56, 27 Ill.Dec. 232, 388 N.E.2d 1281 (1979); *Commonwealth v. Tarver*, 369 Mass. 302, 345 N.E.2d 671 (1975); *People v. Watkins*, 78 Mich. App. 89, 259 N.W.2d 381 (1977); *State v. Carlson*, 267 N.W.2d 170 (Minn. 1978); *State v. Vargus*, 118 R.I. 113, 373 A.2d 150 (1970); *State v. Batten*, 17 Wash. App. 428, 563 P.2d 1287 (1977). In at least one case, *People v. Roff*, 67 A.D.2d 805, 413 N.Y.S.2d 43 (1979), the court struck down hair comparison testimony because the expert stated only that the hair could have come from the same person:

> "The court erred in receiving and refusing to strike the testimony of the chemist that the hair taken from the bathroom and that found at the scene of the crime could have come from the same person and that there was some similarity between the two samples, and erred in receiving the physical evidence itself. 'Expert opinion evidence lacks probative force where the conclusions are contingent, speculative or merely possible' *(People v. Harding*, 59 A.D.2d 897, 898, 399 N.Y.S.2d 57, 59). Since the evidence was inadequate to connect the hair samples with defendant's hair, it was inadmissible, because it did not 'accurately portray a relevant and material element of the case' *(People v. Julian*, 41 N.Y.2d 340, 342, 392 N.Y.S.2d 610, 612, 360 N.E.2d 1310, 1311.)" 67 A.D.2d at 805-06, 413 N.Y.S.2d at 44-45.

It is generally recognized that scientific tests that are relevant to some issue may be admitted into evidence. However, in order for an expert to testify concerning the results of such tests several initial facts must be shown.

The first relates to what is commonly called the *Frye* test which is derived from the following statement in *Frye v. United States,* 54 U.S. App.D.C. 46, 293 F. 1013, 1014 (1923):

> "[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."

Most courts have adopted this rule that there must be general acceptance of the scientific principle which underlies the test. *United States v. Brown,* 557 F.2d 541, 556 (6th Cir. 1977) (ion microprobic test for hair identification); *United States v. Alexander,* 526 F.2d 161, 163-164 (8th Cir. 1975) (polygraph); *United States v. Baller,* 519 F.2d 463, 466 (4th Cir. W. Va. 1975), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (spectrograph analysis); *United States v. Addison,* 162 U.S. App. D.C. 199, 498 F.2d 741, 743 (1974) (spectrograph analysis); *United States v. Stifel,* 433 F.2d 431, 438 (6th Cir. 1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971) (neutron activation analysis); *Marks v. United States,* 260 F.2d 377, 382 (10th Cir. 1958), *cert. denied,* 358 U.S. 929, 79 S.Ct. 315, 3 L.Ed.2d 302 (1959) (polygraph); *United States v. Hearst,* 412 F.Supp. 893 (N.D. Cal. 1976) (psycholinguistic analysis); *People v. Kelly,* 17 Cal.3d 24, 30-31, 130 Cal. Rptr. 144, 148-49, 549 P.2d 1240, 1244-45 (1976) (spectrogram); *Reed v. State,* 283 Md. 374, 385-89, 391 A.2d 364, 368-72 (1978) (spectrogram); *Commonwealth v. Lykus,* 367 Mass. 191, 327 N.E.2d 671, 674, 677-78 (1975) (spectrogram); *State v. Andretta,* 61 N.J. 544, 296 A.2d 644 (1972) (spectrogram); *see* Comment, 64 Corn. L. Rev. 875 (1979).

There is some divergence among courts as to how generally accepted the scientific principle must be and the fact that the test is not completely infallible will not bar its acceptance. *United States v. Brown,* 557 F.2d 541 (6th Cir. 1977); *People v. Allweiss,* 48 N.Y.2d 40, 396 N.E.2d 735, 421 N.Y.S.2d 341 (1979).

Undoubtedly there are certain scientific tests that have been widely used over a long period of time, such that their general acceptance in the scientific community can be judicially noticed. This point was recently made in *Reed v. State,* 283 Md. 374, 391 A.2d 364, 367 (1978):

"On occasion, the validity and reliability of a scientific technique may be so broadly and generally accepted in the scientific community that a trial court may take judicial notice of its reliability. Such is commonly the case today with regard to ballistics tests, fingerprint identification, blood tests, and the like."

Much the same reasoning was followed in our first fingerprint case, *State v. Johnson,* 111 W. Va. 653, 658-59, 164 S.E. 31, 34 (1932), where we quoted this passage from an Illinois decision holding that:

"... there is a scientific basis for the system of finger print identification, and that the courts are justified in admitting this class of evidence; that this method of identification is in such general and common use that the courts cannot refuse to take judicial cognizance of it." *People v. Jennings,* 252 Ill. 534, 549, 96 N.E. 1077, 1082 (1911).

As the Maryland court points out in *Reed, supra,* where the reliability of the scientific test cannot be judicially noticed, its reliability must be demonstrated before the expert can testify concerning the test:

"[I]f the reliability of a particular technique cannot be judicially noticed, it is necessary that the reliability be demonstrated before testimony based on the technique can be introduced into evidence. Although this demonstration will normally include testimony by witnesses, a court can and should also take notice of law journal articles, articles from reliable sources that appear in scientific journals, and other publications which bear on the degree of acceptance by recognized experts that a particular process has achieved. * * * " 283 Md. at 380, 391 A.2d at 367.

This is much the same approach that we followed in *State v. Frazier*, 162 W. Va. 602, 252 S.E.2d 39, 43 (1979), where we reviewed at length the literature and court opinions in regard to the admissibility of a polygraph test and concluded that such tests are not admissible in criminal trials in this State because of several problems, one of which is its questionable scientific reliability.[14]

We do not reach the question in this case as to whether the hair analysis comparison test should have been initially subjected to a determination of its scientific accuracy and reliability. This is because at trial no objection was raised on this point and the expert after giving his general background as a chemist and his training in hair analysis was permitted to testify about the examination that he made in regard to the hair samples. Ordinarily where evidence is introduced at trial without an objection, we will not consider such matters on appeal. *State v. Burton*, 163 W. Va. 40, 254 S.E.2d 129, 140 (1979); *State v. Starkey*, 161 W. Va. 517, 244 S.E.2d 219, 227 (1978); *State v. McGee*, 160 W. Va. 1, 230 S.E.2d 832, 836 (1976), *overruled on other grounds, State v. McAboy*, 236 S.E.2d 431 (1977); *First National Bank v. Bell*, 158 W. Va. 827, 215 S.E.2d 642 (1975); *State v. Pietranton*, 137 W. Va. 477, 492, 72 S.E.2d 617, 625 (1952).

Beyond the initial issue of the accuracy and reliability of the scientific test is the question of whether accepted

---

[14] *Reed v. State*, 283 Md. 374, 381, 391 A.2d 364, 367-68 (1978), made this observation on the standard for reliability of a scientific test as it relates to a trial court's discretion:

"The question of the reliability of a scientific technique or process is unlike the question, for example, of the helpfulness of particular expert testimony to the trier of facts in a specific case. The answer to the question about the reliability of a scientific technique or process does not vary according to the circumstances of each case. it is therefore inappropriate to view this threshold question of reliability as a matter within each trial judge's individual discretion. Instead, considerations of uniformity and consistency of decision-making require that a legal standard or test be articulated by which the reliability of a process may be established."

test procedures were followed by qualified personnel in making the test. In *State v. Hood*, 155 W. Va. 337, 342, 184 S.E.2d 334, 337 (1971), we made this general statement about the necessary foundation for the admissibility of the test results:

> "It further appears that the necessary foundation before the admission of the results of any test are: (1) That the testing device or equipment was in proper working order; (2) that the person giving and interpreting the test was properly qualified; (3) that the test was properly conducted; and (4) that there was compliance with any statutory requirements." (Citations omitted)[15]

Much the same principles have been expressed in *People v. Kelly*, 17 Cal.3d 24, 30, 549 P.2d 1240, 1244, 130 Cal.Rptr. 144, 148 (1976):

> "The parties agree generally that admissibility of expert testimony based upon the application of a new scientific technique traditionally involves a two-step process: (1) the *reliability of the method* must be established, usually by expert testimony, and (2) the witness furnishing such testimony must be properly *qualified as an expert to give an opinion* on the subject. ... Additionally, the proponent of the evidence must demonstrate that correct scientific procedures were used in the particular case."

As we have earlier noted the hair analysis expert had conceded that because of the lack of sufficient known samples of the victims' hair he was unable to determine whether that the hair found in the nests matched the victims' hair. His testimony essentially was that the hair from the nests was human hair and that it came from two separate sources. He was also able to state from microscopic examination that as to two groups of nest hair there were certain similarities with the hair found in one of the victim's pocketbook and on the cloth-

---

[15] *State v. Dyer*, 160 W. Va. 166, 233 S.E.2d 309 (1977), followed *State v. Hood* and centered on the failure to comply with the State Department of Health standards.

ing belonging to both victims by way of natural color and dye characteristics.

Because this case is reversed on other grounds, we need not determine whether the expert's testimony on hair comparison should have been presented to the jury. One of the dangers inherent in expert testimony in regard to scientific tests is that the jury may not understand the exact nature of the test and the particular methodology of the test procedure and accord an undue significance to the expert testimony. This problem was discussed at some length in *People v. Kelly, supra:*

> "Lay jurors tend to give considerable weight to 'scientific' evidence when presented by 'experts' with impressive credentials. We have acknowledged the existence of a '... misleading aura of certainty which often envelops a new scientific process, obscuring its currently experimental nature.' ... As stated in *Addison, supra,* in the course of rejecting the admissibility of voiceprint testimony, 'scientific proof may in some instances assume a posture of mystic infallibility in the eyes of a jury ....' *(United States v. Addison, supra,* 498 F.2d at p. 744.)"

One of the significant problems in the record in the present case is that at no time was the expert asked to describe how comparison characteristics of hair are scientifically determined. In the Federal Bureau of Investigation publication entitled "Microscopy of Hair, A Practical Guide and Manual" (Issue 2, 1977), 11 *et seq.*, there is a list and discussion of some fifteen comparison points.[16] In the initial discussion of the comparison characteristics, this statement is made:

> "In the literature, one may encounter other lists of identifying features in hair which may enumerate 25 or more different characteristics. Those lists generally do not disagree in sub-

---

[16] They are given in the following headings: race, body area, color, length, tip, root, diameter, cuticle, scales, pigment, medulla, cortex, artificial treatment, damage and special characteristics.

stance with the following list but differ only in manner of organizations."

It is apparent that the trial court confronted with this problem should require some *in camera* disclosure of the test results and methodology in order to make an initial determination of whether the expert's testimony should be admitted.

For the foregoing reasons the judgment of the Circuit Court of Monongalia County will be reversed and the case remanded for a new trial

*Reversed and remanded.*